FILED IN DENVER
DISTRICT COURT
DENVER, COLORADO

19CV554

19 OCT 31 AM 9:07

DATE FILED: October 31, 2019
CASE NUMBER: 2019CV554

MICHELE BROWN &

ANDREW MAIKOVICH, Plaintiffs,

v.

COLORADO JUDICIAL BRANCH

(dba COLORADO SURPREME COURT & OFFICE OF THE STATE COURT ADMINISTRATOR), Defendant.

**Complaint and Jury Demand**

COMES NOW the plaintiffs, Andrew Maikovich and Michele Brown, on their own behalf, against the Defendant. Plaintiffs state and allege as follows:

**FACTUAL BACKGROUND**

1. Michele Brown is a 64-year-old African American who is employed by the Colorado general assembly, where she has worked in the legislative legal services office for 27 years. Her husband, Andrew Maikovich, is employed by the Office of the State Court Administrator (SCAO) as an education specialist, where he has worked for 10 years.

2. The Colorado Supreme Court is the state court of last resort, with offices located in the Ralph Carr Judicial Center, 2 E. 14th Ave., Denver, CO. SCAO provides administrative support and services to Colorado Courts, including the Colorado Supreme Court, with offices located at 1300 Broadway, 12th Floor, Denver, CO.

3. On May 2, 2018, Michele Brown applied for a Rules Attorney position posted by the Colorado Supreme Court.

4. In her position with the Colorado state legislature, Ms. Brown had three years of direct experience working with Supreme Court rules, which included close interaction with former Supreme Court Rules Attorney Jenny Moore.

5. Ms. Brown was one of 10 applicants to receive an interview for the Rules Attorney position.

6. Prior to the interview, Ms. Moore told Mr. Maikovich about Ms. Brown, "She'd be perfect for the job. Why didn't she ask me for a recommendation?"

7. The hiring panel for the Rules Attorney position consisted of six individuals:

    - Supreme Court Justice Richard Gabriel
    - Supreme Court Justice Melissa Hart
    - Clerk of the Court Cheryl Stevens
    - Staff Attorney Melissa Meirink
    - Staff Attorney Jennifer Wallace
    - Staff Attorney Jeremy Beck

8. Justice Gabriel led the hiring committee (panel chair).

9. Kathryn Michaels is Caucasian, approximately 33-years-old, and was a law librarian at the Ralph L. Carr Judicial Center.

1

**EXHIBIT B**
19CV554-1

10. On April 16, 2018, Ms. Michaels emailed Ms. Meirink inquiring about the Rules Attorney position.

11. On April 19, 2018, Ms. Meirink and Ms. Michaels personally met and discussed the Rules Attorney position.

12. On April 19, 2018, Ms. Meirink emailed Ms. Michaels asking whether she intended to apply for the Rules Attorney position, stating, in part, "I hope so!"

13. On April 19, 2018, Ms. Michaels emailed Ms. Meirink expressing concern about working a full-time 40-hour per week position, stating, in part, "Thanks again for everything. Please let me know if I'm missing something obvious."

14. On April 20, 2018, Ms. Meirink emailed Ms. Michaels stating there might be a possibility of the position becoming part-time in the future and that there is a lot of flexibility in the office, stating, in part, "Cheryl is VERY reasonable and understanding."

15. In Ms. Meirink's April 20, 2018 email, the "Cheryl" referred to is Clerk of the Court Cheryl Stevens.

16. On or about April 30, 2018, Ms. Stephens and Ms. Michaels met to discuss the Rules Attorney position.

17. On April 30, 2018, Ms. Meirink emailed Ms. Michaels stating, in part, "Cheryl mentioned she talked to you. 😊 Let me know if you have changed your mind and want to talk/grab coffee."

18. On April 30, 2018, Ms. Michaels emailed Ms. Meirink stating, in part, "Thanks, Melissa. 😊 Cheryl asked to see me and mentioned she thinks the Justices would be open to 80%. If that is true, I feel like it changes my decision to apply.... [C]an [I] maybe pop in later this week to pick your brain about a few things?"

19. On May 1, 2018, Ms. Michaels emailed Ms. Meirink stating, in part, "Just a bit of an update: I've decided the position would be perfect for me. I'm very excited to apply and see what happens. Fingers crossed! Thank you so much for all of your help as I figured this out. 😊"

20. On May 8, 2018, Ms. Michaels emailed Ms. Meirink stating, in part, "[D]o you recommend wearing a very conservative black suit? Or something a bit less formal? I need to see if my old suit still fits. ;)"

21. In Ms. Michaels May 8, 2018 email, she also asked Ms. Meirink. "Also, are there any specific topics I should brush up on as far as questions? Obviously no specifics or anything that makes you uncomfortable sharing, just trying to figure out how one would get ready for this type of interview. Thank you!! 😊"

22. On May 8, 2018, Ms. Meirink emailed Ms. Michaels interview advice, including what to wear ("most people wear black"), what she should talk about (nine bulleted recommendations), and key points to add ("Something else they like to ask is whether you need a lot of direction or feedback. The answer, of course, is NO....")

23. In the May 8, 2018 email, Ms. Meirink attached a copy of interview questions the Judicial Branch uses.

24. Ms. Meirink had obtained the questions forwarded to Ms. Michaels in a "Path to Supervision" in-house training course.

25. In the May 8, 2018 email, Ms. Meirink informed Ms. Michaels that she might be asked a few "diplomacy questions," because "You need to be diplomatic when dealing with judges.😊"

2

**EXHIBIT B**

26. Somewhere between the dates of May 8, 2018, and May 17, 2018, Ms. Stevens and Ms. Meirink developed interview questions for the panel to ask the interviewees for the Rules Attorney position.

27. On May 17, 2018, Ms. Stevens emailed Supreme Court Justice Richard Gabriel informing him that she and Ms. Meirink had developed interview questions for the panel to ask during interviews for the Rules Attorney position.

28. On May 22, 2018, the panel interviewed Ms. Michaels.

29. On May 22, 2018, the panel interviewed more than one other applicant.

30. At 2:13 p.m. on May 22, 2018, Ms. Meirink emailed Christopher Ryan, then State Court Administrator, about Ms. Michaels, stating, in part, "I hope you are well…I understand that Kathryn Michaels listed you as a reference. If you have anything that you would like the committee to know about her, or any of the other candidates that you may know, we would certainly welcome your input."

31. On May 23, 2018, the Supreme Court interviewed Ms. Brown for the Rules Attorney position.

32. The interview with Ms. Brown lasted for approximately 40 minutes.

33. On May 23, 2018, the hiring panel interviewed Kara Martin.

34. At the time of the interview, Ms. Martin was approximately 46 years old.

35. During the interview, Justice Richard Gabriel asked Ms. Martin a question similar to, "A majority of the applicants are law clerks. Why does someone like you want the position?"

36. The question Justice Gabriel asked Ms. Martin was inappropriate for the job interview.

37. On May 23 or May 24, 2018, the Supreme Court selected Kathryn Michaels, an approximately 33-year-old Caucasian law librarian, for the Rules Attorney position.

38. At the time of the job offer, Ms. Michaels had never drafted a Supreme Court rule.

39. At the time of the job offer, Ms. Michaels had never edited a Supreme Court rule.

40. At the time of the job offer, Ms. Michaels had never identified an error in a Supreme Court rule.

41. At the time of the job offer, Ms. Michaels had never had an official job responsibility that required her to review a Supreme Court rule.

42. On May 24, 2018, the Supreme Court informed Ms. Brown that she had not been selected for the position.

43. On May 31, 2018, Mr. Maikovich met with Mr. Ryan (then State Court Administrator) and Mindy Macias (then Deputy State Court Administrator) at SCAO offices.

44. During the May 31, 2018, meeting, Mr. Maikovich told them that he and Ms. Brown believed she was more qualified than Ms. Michaels and that Ms. Brown was considering filing a charge with the Equal Employment Opportunity Commission (EEOC).

45. During the May 31, 2018, meeting, Ms. Macias asked Mr. Maikovich whether Ms. Brown would be willing to file a complaint with SCAO's Human Resources (HR) Department.

46. During the May 31, 2018, meeting, Mr. Maikovich told Ms. Macias that Ms. Brown would not file a complaint with HR; rather she would let the EEOC and courts resolve the issue.

47. During the May 31, 2018, meeting, Mr. Maikovich told Mr. Ryan and Ms. Macias that he thought there was a possibility of resolving the issue prior to Ms. Brown's filing a formal charge. Ms. Macias asked what that might entail.

48. During the May 31, 2018, meeting, Mr. Maikovich said that, while it was ultimately Ms. Brown's decision, he and his wife's primary concern was that future applicants not face the same type of discriminatory treatment that Ms. Brown experienced.

49. During the May 31, 2018, meeting, Mr. Maikovich told Mr. Ryan and Ms. Macias that one step in that direction would be to require the Supreme Court to use the hiring policies adopted and required to be used by every other division of the Judicial Branch in the state of Colorado.

50. During the May 31, 2018, meeting, Mr. Maikovich told Mr. Ryan and Ms. Macias that the Colorado Supreme Court might also possibly issue an apology to Ms. Brown.

51. During the May 31, 2018, meeting, Mr. Maikovich handed Mr. Ryan and Ms. Macias a one-page document requesting that the Supreme Court retain all notes, memos, and other documents related to the Rules Attorney hiring process for potential use in litigation.

52. On or about June 4, 2018, Ms. Macias visited Mr. Maikovich's office and thanked him for informing them of Ms. Brown's concerns prior to filing a charge of discrimination. "That doesn't always happen."

53. On or about the June 4, 2018, meeting, Mr. Maikovich asked Ms. Macias whether the Supreme Court had a response to the concerns he expressed at the May 31, 2018, meeting.

54. At the June 4, 2018, meeting, Ms. Macias replied words to the effect, "I don't know. They do what they want to do. They don't do what I tell them. They might get back to you; they might not. I don't know."

55. To the current date, no individual employed by the Colorado Supreme Court has contacted Mr. Maikovich regarding the concerns he described at the May 31, 2018, meeting.

56. During the June 4, 2018, meeting, Ms. Macias again asked Mr. Maikovich whether Ms. Brown would be willing to file a complaint with SCAO's HR Department.

57. During the June 4, 2018, meeting, Mr. Maikovich repeated that Ms. Brown would not file a complaint and they would leave the issue to the EEOC and the courts.

58. On June 6, 2018, Ms. Macias confirmed the facts of the June 4 meeting with Mr. Maikovich in an email, which stated: "I want to clarify our conversation on 6/4 in your office. You mentioned asked [sic] if there was interest in settling this matter before your wife filed with the EEOC and you asked me 'if she should just file?'" As I mentioned I cannot give you or her that advice, but did encourage you to share with your wife to contact HR so that they could conduct an investigation. I want to respect your privacy as you sound from our conversation yesterday that you may still be unsettled as to your direction. I am happy to speak to HR. Before we would consider any action on this matter, we need a finding of fact from your wife and the staff involved in the recruitment process. Thus far, as the branch, we have only heard the story through you as a third party and not your wife as the complainant. Chris and I do not conduct investigations, so any investigation would need to be turned over to HR and would need to take place directly with your wife. You indicated you and your wife do not want HR to conduct an investigation and would rather pursue an investigation through the EEOC. By way of this email I am asking again if you would like for an internal review by HR. Again, I thank you for your transparency and appreciate your work as a branch employee. If your wife wants to file a complaint with HR, please have her contact Eric Brown at eric.brown@judicial.state.co.us."

**EXHIBIT B**

...

59. The May 31 meeting between Mr. Maikovich, Mr. Ryan, and Ms. Macias, and the interaction with Ms. Macias on June 4 are the only face-to-face contacts Mr. Maikovich has had with any Judicial Branch manager or administrator regarding Ms. Brown's potential EEOC charge prior to August 28, 2018.

60. According to the Judicial Branch Complaint Procedure 5 - Recommendations and Penalties, Anti-Harassment and Anti-Discrimination Policy, "all harassment or discrimination complaints involving judicial officers must be forwarded to the Colorado Commission on Judicial Discipline."

61. SCAO is required under its Anti-Harassment and Anti-Discrimination Policy to refer all complaints against judicial officers to the Colorado Commission on Judicial Discipline.

62. If SCAO considered Mr. Maikovich's contacts with Mr. Ryan and Ms. Macias on May 31 or June 4 to be a formal complaint, SCAO was required under its Anti-Harassment and Anti-Discrimination Policy to refer the complaint to the Colorado Commission on Judicial Discipline.

63. Mr. Maikovich's discussions with Mr. Ryan and Ms. Macias about the Supreme Court's hiring process directly involved Justice Gabriel.

64. Mr. Maikovich's discussions with Mr. Ryan and Ms. Macias about the Supreme Court's hiring process directly involved Justice Hart.

65. SCAO did not forward any complaint from Mr. Maikovich or Ms. Brown to the Colorado Commission on Judicial Discipline.

66. On August 28, 2018, Dawn Palutke, then Senior Human Resources Manager at SCAO, sent Mr. Maikovich an email that stated: "The State Court Administrator's Office Human Resources Division has received a complaint and will be looking into this matter further. As part of the review, it is our understanding that you may have pertinent information that could assist us in our investigation. We have scheduled a time for you to meet with Chief Human Resources Officer, Eric Brown, and a 3rd party investigator, Director of Human Resources Paul Buckley of the Missouri State Courts to discuss the matter. A meeting with you has been scheduled at 10:30 a.m. on September 6th in the HR conference room. Per the Colorado Judicial Department Code of Conduct, you are required to fully cooperate with the investigation/inquiry by being candid and honest, thorough and disclosing any relevant knowledge or evidence."

67. On August 28, 2018, Mr. Maikovich sent a reply email to Ms. Palutke stating that she must have the wrong "Andy" because he didn't know anyone in Missouri, nor could he think of any investigation about which he might have knowledge.

68. On August 28, 2018, Ms. Palutke sent Mr. Maikovich a reply that he was indeed the correct "Andy" and that she didn't know what the investigation was about.

69. On August 28, 2018, Ms. Palutke emailed Supreme Court Justice Melissa Hart confirming her meeting with Mr. Buckley, stating, "I am writing this email to confirm the date and time in which Eric Brown and our 3rd party consultant, Paul Buckley, will be meeting with you in regards to the applicant complaint of the recent hiring process."

70. On August 28, 2018, Ms. Palutke emailed Ms. Meirink, stating "The State Court Administrator's Office Human Resources Division has received a complaint from a member of the public regarding a recent Judicial hiring process."

71. On September 3, 2018, then Human Resources Director Eric Brown emailed Mr. Buckley that Ms. Brown would "be a no show and is our complainant."

**EXHIBIT B**

72. On September 6, 2018, Mr. Maikovich reported to the required interview.
73. On September 6, 2018, Mr. Buckley interviewed Mr. Maikovich. Mr. Brown attended.
74. During the September 6 interview, Mr. Buckley asked Mr. Maikovich questions closely resembling the following (please affirm or deny each question individually):
    a) Do you have training into whether a question is legally proper during an interview?
    b) What type of training?
    c) When did Ms. Brown learn about the job?
    d) How did she learn about the job?
    e) Did she call you after the interview was over?
    f) How long was it that she called you after the interview?
    g) What did she tell you about the interview?
    h) What did you say to her?
    i) Did she complain about any of the questions being discriminatory?
    j) Do you have any other information that the selection was discriminatory?
    k) When did Ms. Brown learn she didn't get the job?
    l) How did she feel?
    m) How disappointed was she?
    n) What other jobs has Ms. Brown applied for in the past 10 years?
75. Mr. Buckley asked Mr. Maikovich additional questions to those listed above.
76. Neither Mr. Buckley nor Mr. Brown made an audio recording of the interview with Mr. Maikovich.
77. Neither Mr. Buckley nor Mr. Brown took notes of the questions asked of Mr. Maikovich.
78. Neither Mr. Buckley nor Mr. Brown took notes of the answers Mr. Maikovich provided.
79. C.R.S. § 13-90-107 protects individuals in Colorado from being forced to testify against their spouse without consent.
80. C.R.S. § 13-90-107 protects individuals in Colorado from being forced by the Judicial Branch of Colorado to discuss confidential conversations with their husband/wife in the privacy of their home when that spouse reports or opposes discriminatory practices (whether ultimately found to have merit or not).
81. On September 17, 2018, Ms. Brown filed a charge of discrimination based on race (Title VII) and age (ADEA) with the EEOC.
82. On November 9, 2018, the Supreme Court filed a response to Ms. Brown's EEOC charge. In its response, the Supreme Court wrote, in part, that Ms. Brown's "Charge lacks any factual assertion supporting its claims that the Court discriminated against her besed [sic] on race or age."
83. In its response to Ms. Brown's EEOC charge, the Supreme Court wrote, "While some aspects of Ms. Brown's prior experience aligned well with the role...."

6

**EXHIBIT B**

84. In its response to Ms. Brown's EEOC charge, the Supreme Court wrote, in part, "Ms. Brown, in her current role, performs some of the duties of the role for another government entity."

85. In its response to Ms. Brown's EEOC charge, the Supreme Court wrote, in part, that Ms. Brown did not "stand out" during her interview for the Rules Attorney position.

86. On March 1, 2019, Mr. Maikovich filed a charge of discrimination with the Colorado Civil Rights Division (CCRD) of the Department of Regulatory Agencies against Colorado Judicial alleging harassment and/or discriminatory terms and conditions of employment based on retaliation for engaging in protected activity.

87. On April 10, 2019, SCAO filed a Position Statement with the CCRD in response to Mr. Maikovich's discrimination charge.

88. In its Position Statement to the CCRD, SCAO stated in part:
    - Mr. Maikovich's [sic] Was Interviewed Because He Was the Complaining Party
    - Mr. Maikovich Has Not Been Retaliated Against

89. On April 17, 2019, Mr. Maikovich hand-delivered a Public Access to Information and Records Rules (P.A.I.R.R.) request to SCAO signed by Ms. Brown requesting documents related to the EEOC and CCRD charges.

90. On April 17, 2019, SCAO front desk receptionist Madelyn Schwenn was physically present at the Ralph Carr Judicial Center.

91. On April 17, 2019, Ms. Schwenn was physically present at her desk at the Ralph Carr Judicial Center on at least two occasions.

92. At approximately noon on April 17, 2019, Mr. Maikovich met Ms. Schwenn in face-to-face contact.

93. During an April 17, 2019, conversation, Mr. Maikovich told Ms. Schwenn that he had a document he needed to give her.

94. During an April 17, 2019, conversation, Ms. Schwenn told Mr. Maikovich to leave it on her desk and that she would pick up the document when she returned to her desk.

95. On April 17, 2019, when Ms. Schwenn returned to her desk, she found a document on her keyboard (or close thereto).

96. On April 17, 2019, Ms. Schwenn physically handled the document that was located on her keyboard.

97. Ms. Schwenn assumed the document on her desk was the one Mr. Maikovich had described to her.

98. The document handled by Ms. Schwenn was Ms. Brown's P.A.I.R.R. request.

99. On April 19, 2019, at approximately 8 a.m., Ms. Schwenn brought the document to Mr. Maikovich's office and asked him, "What do you want me to do with this again?"

100. On April 19, 2019, at approximately 8 a.m., Mr. Maikovich replied with words to the effect of, "Maddie, I'm on the opposite side of a legal issue I'm having with the office. So I'm not someone who you probably should listen to. But as a friend, you cannot go wrong if you take it to the legal department."

101. According to a Chief Justice Directive and departmental rules, SCAO is required to respond within three business days of receipt of a P.A.I.R.R. request.

**EXHIBIT B**

102. In a letter signed by Legal Counsel Terri Morrison dated April 25, 2019, to Ms. Brown, it states that she would officially respond to the P.A.I.R.R. request by May 6, 2019.

103. In addition, Ms. Morrison's letter dated April 25, 2019, states: "Although the request appears to have been delivered on April 17, 2019, the full-time receptionist was not in the office that day and when she returned to the office, she found the request on her desk. Because the request was not addressed to a particular person it took some time for her to determine to whom it should be directed, so I did not receive it until Monday, April 22."

104. On April 27, 2019, Ms. Brown received the April 25, 2019, letter signed by Judicial Legal Counsel Morrison via the U.S. Postal Service.

105. On April 30, 2019, Mr. Maikovich hand-delivered a complaint to the office of Chief Justice Nathan Coats stating that SCAO had failed to timely comply with Ms. Brown's P.A.I.R.R. request and that SCAO Legal Counsel Morrison had made a factual misrepresentation regarding the missed deadline for responding to Ms. Brown.

106. On May 1, 2019, Mr. Ryan hand-delivered a response "on behalf of" Chief Justice Coats to the SCAO desk of Mr. Maikovich regarding his complaint about SCAO's untimely processing of the P.A.I.R.R. request.

107. In the May 1, 2019, letter, Chief Justice Coats did not indicate or state whether Ms. Morrison's reply to Ms. Brown's P.A.I.R.R. request was untimely.

108. In the May 1, 2019, letter, Chief Justice Coats did not address Mr. Maikovich's allegation that Ms. Morrison had made a factual misrepresentation regarding the receipt of Ms. Brown's P.A.I.R.R. request.

109. On May 3, 2019, Mr. Maikovich hand-delivered a letter to the desk of Mr. Ryan that thanked Chief Justice Coats for his May 1 response.

110. In his May 3, 2019 letter, Mr. Maikovich directly asked whether Chief Justice Coats believed that Ms. Morrison had complied with the time requirements for responding to a P.A.I.R.R. request.

111. In his May 3, 2019 letter, Mr. Maikovich directly asked whether Mr. Ryan believed that Ms. Morrison had complied with the time requirements for responding to a P.A.I.R.R. request.

112. Following the May 3, 2019, letter, Chief Justice Coats never contacted Mr. Maikovich regarding whether he believed SCAO met the time deadlines required by Chief Justice Directives and the P.A.I.R.R. request form.

113. Following the May 3, 2019, letter, Mr. Ryan never contacted Mr. Maikovich regarding whether he believed SCAO met the time deadlines required by Chief Justice Directives and the P.A.I.R.R. request form.

114. On May 6, 2019, Ms. Morrison emailed Ms. Brown a response to her P.A.I.R.R. request, listing which records were available, unavailable, redacted, and withheld.

115. Ms. Morrison's May 6 letter stated that it would cost $726.75 to receive copies of the documents that were available.

116. On May 15, 2019, Mr. Maikovich hand-delivered to Ms. Morrison a check in the amount of $726.75 for copies of the P.A.I.R.R. documents.

117. On May 15, 2019, Ms. Morrison delivered a folder of documents to Mr. Maikovich, asking him to forward them to Ms. Brown.

**EXHIBIT B**

118. The Colorado Judicial Department's Anti-Harassment and Anti-Discrimination Policy states: "Discrimination…includes treating someone unfavorably because the person is married to or otherwise associated with a person of a certain race, color, national origin, gender, age, sexual orientation, gender identify, religion, socioeconomic status or disability."

119. As an employee of SCAO, Mr. Maikovich is protected by the Colorado Judicial Department's Anti-Harassment and Anti-Discrimination Policy.

120. As an employee of SCAO, if Mr. Maikovich files a complaint of discrimination, he has a right to the protections listed in Chief Justice Directive 08-06: Anti-Harassment and Anti-Discrimination Policy.

121. As an employee of SCAO, if Mr. Maikovich files a complaint of discrimination, he has the right to a fair and complete investigation, appropriate action being taken, and to be free from retaliation.

122. SCAO does not possess a complaint signed by Mr. Maikovich.

123. SCAO does not possess a complaint in which Mr. Maikovich is listed as a "complainant."

124. Prior to its April 10, 2019, Position Statement, SCAO did not possess any document that lists or describes Mr. Maikovich as a complainant to a charge of discrimination.

125. Prior to its April 10, 2019, Position Statement, SCAO did not possess any document that lists or describes Mr. Maikovich as a complainant in any action.

126. The first time Mr. Maikovich was described as a "complainant" in any official Judicial Branch document was in SCAO's April 10, 2019, Position Statement.

127. Prior to its April 10, 2019, Position Statement, no individual employed by the Judicial Branch informed Mr. Maikovich in writing or verbally that he was the "complaining party" or a "complainant" to any charge of discrimination.

128. Prior to its April 10, 2019, Position Statement, no individual employed by the Colorado Judicial Branch informed Mr. Maikovich in writing or verbally that he was the "complaining party" or a "complainant" to any violation of Judicial Branch policies whatsoever.

129. The Colorado Judicial Branch is unaware of any individual employed by the branch ever requesting that Mr. Maikovich sign a complaint of discrimination.

130. The Colorado Judicial Branch is unaware of any individual employed by the branch ever requesting that Mr. Maikovich sign a complaint regarding any violation of Judicial Branch policies.

131. To the current date, no individual employed by the Colorado Judicial Branch has ever advised Mr. Maikovich that an investigation was completed on a charge and/or complaint filed by him.

132. In its April 10, 2019, Position Statement, SCAO wrote, in part, "Mr. Maikovich is asserting that the Department's process to follow its policy after learning of claimed discrimination is support for a retaliation claim, likely because Mr. Maikovich did not receive the response he expected."

133. Ms. Brown has never filed a formal charge or complaint with Human Resources at SCAO.

134. The Colorado Judicial Branch is unaware of any individual employed by the Human Resources Department at SCAO who has spoken to Ms. Brown about her failure to be hired by the Colorado Supreme Court.

135. To the current date, no individual employed by the Colorado Judicial Branch has ever advised Ms. Brown that an investigation was performed or completed on a charge and/or complaint filed by her.

**EXHIBIT B**

136. To the current date, no individual employed by the Colorado Judicial Branch has ever provided Ms. Brown either in writing or verbally with the results of any investigation performed or completed regarding the hiring of a Rules Attorney.

137. To the current date, no individual employed by the Colorado Judicial Branch has ever provided Ms. Brown either in writing or verbally with the results of any investigation performed or completed regarding any position.

138. In early May of 2019, the State Auditor informed Chief Justice Coats that the Auditors office had received allegations meriting formal investigation of fraud at the highest levels of the State Court Administrator's Office.

139. In early May of 2019, Chief Justice Coats requested that the State Auditor conduct a statutory fraud investigation.

140. On or about May 28, 2019, the Judicial Branch of the state of Colorado awarded Ms. Macias the Judicial Excellence Award as the Collaborative Leader of the Year.

141. On or about May 28, 2019, Chief Justice Coats physically handed Ms. Macias the Judicial Excellence Award as the Collaborative Leader of the Year.

142. On or about July 18, 2019, Mr. Ryan resigned as State Court Administrator.

143. Mr. Ryan was asked to resign by one or more members of the Colorado Supreme Court because of information that was uncovered by state auditors.

144. On or about July 18, 2019, the Colorado Supreme Court terminated Ms. Macias's $2.5 million sole-source contract to provide leadership service training to the Judicial Branch.

145. Ms. Macias's $2.5 million contract to provide leadership service training to the Judicial Branch was a sole-source contract.

146. At the time that it was executed, Chief Justice Coats was aware that Ms. Macias's $2.5 million contract was a sole-source contract.

147. Following the termination of Ms. Macias's sole-source contract, Chief Justice Coats wrote an email to SCAO employees with words to the effect that Ms. Macias had secretly taped a conversation with then Chief Justice Nancy Rice regarding Ms. Macias's failed application to become the State Court Administrator.

148. According to the email sent by Chief Justice Coats, Ms. Macias's contract was terminated because she had secretly taped a conversation with a Judicial Branch employee.

149. During her tenure at Colorado Judicial as Human Resources Director and/or Deputy State Court Administrator, Ms. Macias recorded more than one conversation with Judicial Branch employees without their knowledge.

150. During her tenure at Colorado Judicial as Human Resources Director and/or Deputy State Court Administrator, Ms. Macias recorded five or more conversations with Judicial Branch employees without their knowledge.

151. The fact that Ms. Macias secretly recorded conversations while HR Director and/or Deputy State Court Administrator was known by one or more SCAO employees (in addition to Ms. Macias).

152. On or about July 19, 2019, HR Director Brown resigned his position at SCAO.

153. HR Director Brown's resignation was prompted by findings made by one or more state audits.

**EXHIBIT B**

154. At some time period while working at SCAO, Ms. Macias and Mr. Brown conducted a private consulting business in which they received monetary remuneration.

155. Ms. Macias was Mr. Brown's direct supervisor when she was the HR Director at SCAO.

156. Ms. Macias was Mr. Brown's direct supervisor when she was the Deputy State Court Administrator at SCAO.

157. On or about the first week of August of 2019, a CCRD mediator contacted SCAO and asked whether the office would be interested in mediating Mr. Maikovich's discrimination charge.

158. On or about the first week of August of 2019, SCAO informed the CCRD that it was not interested in entering mediation regarding Mr. Maikovich's charge.

159. On August 9, 2019, the EEOC issued Ms. Brown a Right to Sue letter with respect to her charge of age and race discrimination.

160. On August 12, Ms. Brown received the EEOC Right to Sue letter with respect to her charge of age and race discrimination.

161. On or about August 22, 2019, SCAO placed acting HR Director Palutke on leave.

162. On or about August 22, 2019, Ms. Palutke was placed on leave because of findings made by one or more state audits.

163. On September 2, 2019, plaintiffs sent a "Notice of Intent to Sue" to the Colorado Supreme Court, State Court Administrator's Office, and the Colorado Attorney General's Office.

164. On October 28, 2019, the CCRD issued Mr. Maikovich a Right to Sue letter with respect to his charge of disparate treatment and retaliation.

165. By letter dated November 9, 2018, the Colorado Supreme Court submitted a position statement to the EEOC in which it wrote that "Ms. Brown alleges no facts to support her assertion that she was discriminated against by the court because of her race and age."

166. Justice Brian Boatright asserts that Ms. Brown has provided no facts to support her assertion that she was discriminated against by the court because of her race and age.

167. Justice William Hood asserts that Ms. Brown has provided no facts to support her assertion that she was discriminated against by the court because of her race and age.

168. Justice Richard Gabriel asserts that Ms. Brown has provided no facts to support her assertion that she was discriminated against by the court because of her race and age.

169. Justice Melissa Hart asserts that Ms. Brown has provided no facts to support her assertion that she was discriminated against by the court because of her race and age.

170. Justice Carlos Samour asserts that Ms. Brown has provided no facts to support her assertion that she was discriminated against by the court because of her race and age.

171. Justice Monica Márquez asserts that Ms. Brown has provided no facts to support her assertion that she was discriminated against by the court because of her race and age.

172. Chief Justice Nathan Coats asserts that Ms. Brown has provided no facts to support her assertion that she was discriminated against by the court because of her race and age.

**FIRST CLAIM FOR RELIEF**

**EXHIBIT B**

173. Plaintiff Michele Brown reiterates in full the allegations contained in the Factual Background regarding the hiring of a Rules Attorney by the Colorado Supreme Court.

174. On or about May 24, 2018, the Colorado Supreme Court hired Kathryn Michaels, an approximately 33-year-old Caucasian law librarian for the position of Rules Attorney.

175. Ms. Michaels had less experience than Ms. Brown, a 64-year-old African American.

176. By hiring a less qualified individual for the Rules Attorney position, the Colorado Supreme Court violated the following state and federal laws:

    - C.R.S. § 24-34-402. Discriminatory or unfair employment practices;
    - 42 U.S.C. §§ 2000e-2 and 2000e-3 (Title VII); and
    - 29 U.S.C. § 623 (ADEA)

WHEREFORE plaintiff Michele Brown prays for damages as specified below.

### SECOND CLAIM FOR RELIEF

177. Plaintiff Andrew Maikovich reiterates in full the allegations contained in the Factual Background regarding the actions of the Office of the State Court Administrator, which engaged in disparate treatment and/or retaliation in violation of Title VII and the ADEA against Ms. Brown's husband, Mr. Maikovich, after he informed them of his wife's concerns about the Supreme Court's hiring practices.

178. By engaging in disparate treatment and/or retaliation against Mr. Maikovich, SCAO violated the disparate treatment and retaliatory provisions in the following state and federal laws:

    - C.R.S. § 24-34-402. Discriminatory or unfair employment practices;
    - 42 U.S.C. §§ 2000e-2 and 2000e-3 (Title VII); and
    - 29 U.S.C. § 623 (ADEA)

WHEREFORE plaintiff Andrew Maikovich prays for damages as specified below.

### THIRD CLAIM FOR RELIEF

179. Plaintiffs Michele Brown and Andrew Maikovich reiterate in full the allegations contained in the Factual Background regarding the actions of the Office of the State Court Administrator, which required Mr. Maikovich to answer questions regarding confidential conversations he had with his wife in the privacy of their home.

180. By requiring Mr. Maikovich to answer questions regarding confidential conversations he had with his wife in the privacy of their home, the Office of State Court Administrator violated C.R.S. § 13-90-107, as well as state and federal constitutional rights of association and marital privacy.

WHEREFORE plaintiffs Andrew Maikovich and Michele Brown pray for damages as specified below.

### FOURTH CLAIM FOR RELIEF

181. Plaintiff Andrew Maikovich reiterates in full the allegations contained in the Factual Background regarding the actions of the Office of the State Court Administrator with respect to violating Human Resources rules it is required to follow with respect to all employees. As stated and later confirmed

EXHIBIT B

by Ms. Macias in an email dated June 6, 2018, "Before we would consider any action on this matter, we need a finding of fact from your wife and the staff involved in the recruitment process. Thus far, as the branch, we have only heard the story through you as a third party and not your wife as the complainant." The Office of the State Court Administrator only alleged Mr. Maikovich was the complainant in response to his charge with the CCRD. The allegation he was the complainant is pretext for discrimination.

182. The Supreme Court has held that procedures in an employment manual may be enforced by an employee under ordinary contract principles under a theory of promissory estoppel.

183. Representations made by employers in regulations or handbooks can create binding implied employment contracts. When a court recognizes the contractual enforceability of a regulation or handbook, all of the policies contained therein are binding upon the parties.

184. By failing to follow the rules afforded to employees within the Judicial Branch, the Office of the State Court Administrator violated the contract rights of an employee, Andrew Maikovich.

WHEREFORE plaintiff Andrew Maikovich prays for damages as specified below.

### REQUEST FOR DAMAGES AND JURY TRIAL

WHEREFORE, Plaintiffs pray this Court enter judgment in their favor and against the Defendant as follows:

1. Back pay for Ms. Brown, placement into the position of Rules Attorney, and/or front pay to be determined. Defendant will also pay appropriate retirement contributions as determined.

2. $250,000 to Ms. Brown and Mr. Maikovich (combined) for violating their constitutional rights of association and marital privacy.

3. Injunctive relief to protect the rights of future applicants, employees, and spouses at the Colorado Supreme Court and SCAO.

4. Interest on such awards, reasonable attorney fees and costs, expert witness fees, and such other and further relief as the Court deems proper under the circumstances.

Plaintiffs request a jury trial on all issues presented.

_____
Michele D. Brown

_____
Andrew J. Maikovich

**EXHIBIT B**