IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-03362-MEH

MICHELE BROWN, and
ANDREW MAIKOVICH,

      Plaintiffs,

v.

COLORADO JUDICIAL BRANCH d/b/a Colorado Supreme Court d/b/a Office of the State Court
Administrator,

      Defendant.

_____

# ORDER
_____

**Michael E. Hegarty, United States Magistrate Judge.**

      Before the Court are Defendant's[1] Motion to Dismiss Claims Two, Three, and Four (ECF
13)[2] and Plaintiffs' Motion for Sanctions (ECF 14).  Defendant contends Plaintiffs lack standing
and/or it is entitled to immunity from Plaintiffs' third claim for relief and, otherwise, Plaintiffs fail
to state plausible second, third, and fourth claims.  Plaintiffs counter that Defendant waived any
immunity, should be sanctioned for its litigation conduct and being unaware of a binding Supreme
Court opinion, and have failed to demonstrate Plaintiffs' claims should be dismissed.  For the
reasons that follow, the Court will grant the Defendant's motion and deny without prejudice the

---

[1]Defendant contends, and Plaintiffs do not rebut, that Defendant is properly named as,
"Colorado Judicial Department."

[2]On May 7, 2020, well after briefing was completed on February 19, 2020, Plaintiffs filed
a "Supplemental Response in Opposition to Defendant's Motion to Dismiss Claims Two, Three,
and Four."  ECF 44.  Because Plaintiffs failed to seek permission to file the supplement, the
Court struck it on May 8, 2020.  ECF 45.  Plaintiffs have taken no action with respect to the
supplement since that time.

Plaintiffs' motion.

## STATEMENT OF FACTS

The following are relevant factual allegations (as opposed to legal conclusions, bare assertions, or merely conclusory allegations) made by Plaintiffs in their Complaint, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(1) pursuant to *Holt v. United States*, 46 F.3d 1000, 1002 (10th 1995) and under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff Michele Brown ("Plaintiff Brown" or "Brown")[3] is a 64-year-old African American who is employed by the Colorado General Assembly, where she has worked in the legislative legal services office for twenty-seven years. Her husband, Plaintiff Andrew Maikovich, is employed by the Office of the State Court Administrator ("SCAO") as an education specialist, where he has worked for ten years. The SCAO provides administrative support and services to Colorado courts, including the Colorado Supreme Court.

On May 2, 2018, Plaintiff Brown applied for a Rules Attorney position posted by the Colorado Supreme Court. In her position with the Colorado legislature, Brown had three years of experience working with the rules of the Colorado Supreme Court, which included close interaction with former Supreme Court Rules Attorney Jenny Moore. Brown was one of ten applicants to receive an interview for the Rules Attorney position. Prior to the interview, Moore stated to Maikovich that Brown would "be perfect for the job. Why didn't she ask me for a recommendation?"

---

[3]Another individual involved in the alleged incidents is Eric Brown, Chief Human Resources Director for Defendant; to avoid any confusion, the Court will refer to him simply as Eric Brown.

The hiring panel for the Rules Attorney position consisted of six individuals: (1) the Honorable Richard Gabriel, Supreme Court Justice; (2) the Honorable Melissa Hart, Supreme Court Justice; (3) Cheryl Stevens, Clerk of the Court; (4) Melissa Meirink, Staff Attorney; (5) Jennifer Wallace, Staff Attorney; and (6) Jeremy Beck, Staff Attorney.   Justice Gabriel led the hiring committee as the "panel chair."

Kathryn Michaels is Caucasian, approximately 33 years old, and was a law librarian at the Ralph L. Carr Judicial Center.  On April 16, 2018, Michaels emailed Meirink inquiring about the Rules Attorney position.  On April 19, 2018, Meirink and Michaels met and discussed the Rules Attorney position.  That same day, Meirink emailed Michaels asking whether she intended to apply for the Rules Attorney position, stating, in part, "I hope so!"  Michaels responded expressing concern about working a full-time forty-hour per week position, stating in part, "Thanks again for everything. Please let me know if I'm missing something obvious."  On April 20, 2018, Meirink emailed Michaels stating there might be a possibility of the position becoming part-time in the future, and that there was a lot of flexibility in the office, stating in part, "Cheryl [Stevens] is VERY reasonable and understanding."

On or about April 30, 2018, Stevens and Michaels met to discuss the Rules Attorney position.  The same day, Meirink emailed Michaels stating in part, "Cheryl mentioned she talked to you. Let me know if you have changed your mind and want to talk/grab coffee."  Michaels responded stating in part, "Thanks, Melissa. Cheryl asked to see me and mentioned she thinks the Justices would be open to 80%. If that is true, I feel like it changes my decision to apply. . . . [C]an [I] maybe pop in later this week to pick your brain about a few things?"  The next day, Michaels emailed Meirink stating in part, "Just a bit of an update: I've decided the position would be perfect for me. I'm very excited to apply and see what happens. Fingers crossed! Thank you so much for

3

all of your help as I figured this out."

On May 8, 2018, Michaels emailed Meirink stating in part, "[D]o you recommend wearing a very conservative black suit? Or something a bit less formal? I need to see if my old suit still fits. . . . Also, are there any specific topics I should brush up on as far as questions? Obviously no specifics or anything that makes you uncomfortable sharing, just trying to figure out how one would get ready for this type of interview. Thank you!!"  Meirink emailed Michaels interview advice, including what to wear ("most people wear black"), what she should talk about (nine bulleted recommendations), and key points to add ("Something else they like to ask is whether you need a lot of direction or feedback. The answer, of course, is NO. . . ."). Meirink attached a copy of interview questions the Judicial Branch uses, which Meirink obtained in a "Path to Supervision" in-house training course.  Finally, Meirink informed Michaels that she might be asked a few "diplomacy questions," stating, "You need to be diplomatic when dealing with judges."

Between May 8, 2018, and May 17, 2018, Stevens and Meirink developed interview questions for the panel to ask interviewees for the Rules Attorney position.  On May 17, 2018, Stevens emailed Justice Gabriel informing him that she and Meirink had prepared the interview questions.  On May 22, 2018, the panel interviewed Michaels and other applicants.  At 2:13 p.m. on May 22, 2018, Meirink emailed Christopher Ryan, then State Court Administrator, stating in part, "I hope you are well. . . . I understand that Kathryn Michaels listed you as a reference. If you have anything that you would like the committee to know about her, or any of the other candidates that you may know, we would certainly welcome your input."

On May 23, 2018, the Supreme Court interviewed Plaintiff Brown for the Rules Attorney position. The interview lasted approximately forty minutes.  The panel also interviewed Kara Martin, who was approximately forty-six years old.  During the interview, Justice Gabriel asked

Martin a question similar to, "A majority of the applicants are law clerks. Why does someone like you want the position?"

On May 23 or May 24, 2018, the Supreme Court selected Michaels for the Rules Attorney position. At the time of the job offer, Michaels had never drafted or edited a Supreme Court rule, identified an error in a Supreme Court rule, or had an official job responsibility that required her to review a Supreme Court rule. On May 24, 2018, the Supreme Court informed Plaintiff Brown that she had not been selected for the position.

On May 31, 2018, Plaintiff Maikovich met with Ryan and Mindy Macias (then Deputy State Court Administrator) at the SCAO. During the meeting, Maikovich informed Ryan and Macias that he and Plaintiff Brown believed Brown was more qualified than Michaels, and that Brown was considering filing a charge with the Equal Employment Opportunity Commission ("EEOC"). Macias asked Maikovich whether Plaintiff Brown would be willing to file a complaint with SCAO's Human Resources ("HR") Department. Maikovich responded that Brown would not file a complaint with HR; rather, she wanted to "let the EEOC and courts resolve the issue." Maikovich stated, however, that he thought it might be possible to resolve the issue if the Supreme Court were required "to issue an apology" to Brown and "to use the hiring policies adopted and required to be used by every other division of the judicial branch in the state of Colorado." Maikovich then handed Ryan and Macias a one-page document requesting that the Supreme Court retain all notes, memoranda, and other documents related to the Rules Attorney hiring process for potential use in litigation.

On or about June 4, 2018, Macias visited Maikovich in his office and thanked him for informing her of Plaintiff Brown's concerns prior to filing a charge of discrimination. Macias said, "That doesn't always happen." Maikovich asked Macias whether the Supreme Court had a response to the concerns he expressed at the May 31, 2018 meeting. Macias replied to the effect, "I don't

know. They do what they want to do. They don't do what I tell them. They might get back to you; they might not. I don't know." She also again asked Maikovich whether Brown would be willing to file a complaint with SCAO's HR Department. Maikovich repeated that Brown would not file a complaint and would "leave the issue to the EEOC and the courts." To date, no individual employed by the Colorado Supreme Court has contacted Maikovich regarding the concerns he described at the May 31, 2018 meeting.

On June 6, 2018, Macias followed up her June 4 meeting with Maikovich in an email:

> I want to clarify our conversation on 6/4 in your office. You mentioned asked [sic] if there was interest in settling this matter before your wife filed with the EEOC and you asked me "if she should just file?" As I mentioned I cannot give you or her that advice, but did encourage you to share with your wife to contact HR so that they could conduct an investigation. I want to respect your privacy as you sound from our conversation yesterday that you may still be unsettled as to your direction. I am happy to speak to HR. Before we would consider any action on this matter, we need a finding of fact from your wife and the staff involved in the recruitment process. Thus far, as the branch, we have only heard the story through you as a third party and not your wife as the complainant. Chris and I do not conduct investigations, so any investigation would need to be turned over to HR and would need to take place directly with your wife. You indicated you and your wife do not want HR to conduct an investigation and would rather pursue an investigation through the EEOC. By way of this email I am asking again if you would like for an internal review by HR. Again, I thank you for your transparency and appreciate your work as a branch employee. If your wife wants to file a complaint with HR, please have her contact Eric Brown at eric.brown@judicial.state.co.us.

The May 31, 2018 meeting and Maikovich's June 4, 2018 interaction with Macias are the only face-to-face contacts Maikovich has had with any Judicial Branch manager or administrator regarding Plaintiff Brown's potential EEOC charge prior to August 28, 2018.

According to the Judicial Branch Complaint Procedure 5 – Recommendations and Penalties – Anti-Harassment and Anti-Discrimination Policy, "all harassment or discrimination complaints involving judicial officers must be forwarded to the Colorado Commission on Judicial Discipline." According to Plaintiffs, Maikovich's discussions with Ryan and Macias about the Supreme Court's

hiring process "involved" Justice Gabriel and Justice Hart.  SCAO did not forward any complaint

from Maikovich or Brown to the Colorado Commission on Judicial Discipline.

On August 28, 2018, Dawn Palutke, then Senior Human Resources Manager at SCAO,  sent

Maikovich the following email:

> The State Court Administrator's Office Human Resources Division has received a
> complaint and will be looking into this matter further. As part of the review, it is our
> understanding that you may have pertinent information that could assist us in our
> investigation. We have scheduled a time for you to meet with Chief Human
> Resources Officer, Eric Brown, and a 3rd party investigator, Director of Human
> Resources Paul Buckley of the Missouri State Courts to discuss the matter. A
> meeting with you has been scheduled at 10:30 a.m. on September 6th in the HR
> conference room. Per the Colorado Judicial Department Code of Conduct, you are
> required to fully cooperate with the investigation/inquiry by being candid and honest,
> thorough and disclosing any relevant knowledge or evidence.

Maikovich sent a reply stating Palutke must have the wrong "Andy," because he did not know

anyone in Missouri, nor could he think of any investigation about which he might have knowledge.

Palutke replied that he was indeed the correct "Andy," and that she did not know what the

investigation was about.  That same day, Palutke emailed Justice Hart confirming her meeting with

Buckley, stating, "I am writing this email to confirm the date and time in which Eric Brown and our

3rd party consultant, Paul Buckley, will be meeting with you in regards to the applicant complaint

of the recent hiring process."   Palutke also emailed Meirink stating, "The State Court

Administrator's Office Human Resources Division has received a complaint from a member of the

public regarding a recent Judicial hiring process."

On September 3, 2018, Eric Brown emailed Buckley that Plaintiff Brown would "be a no

show and is our complainant."  On September 6, 2018, Maikovich reported to the required interview

with Buckley, who asked questions closely resembling the following:

a)      Do you have training into whether a question is legally proper during an
        interview?

b)   What type of training?

c)   When did Ms. Brown learn about the job?

d)   How did she learn about the job?

e)   Did she call you after the interview was over?

f)   How long was it that she called you after the interview?

g)   What did she tell you about the interview?

h)   What did you say to her?

i)   Did she complain about any of the questions being discriminatory?

j)   Do you have any other information that the selection was discriminatory?

k)   When did Ms. Brown learn she didn't get the job?

l)   How did she feel?

m)   How disappointed was she?

n)   What other jobs has Ms. Brown applied for in the past 10 years?

Plaintiffs contend this is not an exhaustive list.  Neither Buckley nor Eric Brown recorded the interview or took notes of the questions asked and answers given.

On September 17, 2018, Plaintiff Brown filed with the EEOC a charge of discrimination based on her race and age.  On November 9, 2018, the Supreme Court filed a response to Brown's charge stating, in part, that "Ms. Brown alleges no facts to support her assertion that she was discriminated against by the court because of her race and age"; Brown's "[c]harge lacks any factual assertion supporting its claims that the Court discriminated against her besed [sic] on race or age"; "[w]hile some aspects of Ms. Brown's prior experience aligned well with the role . . . "; "Ms. Brown, in her current role, performs some of the duties of the role for another government entity"; and, Brown did not "stand out" during her interview for the Rules Attorney position.

8

On March 1, 2019, Maikovich filed a charge of discrimination with the Colorado Civil Rights Division ("CCRD") against Defendant alleging harassment and/or discriminatory terms and conditions of employment based on retaliation for engaging in protected activity.  On April 10, 2019, the SCAO filed a response to Maikovich's charge, stating in part, "Mr. Maikovich's [sic] was interviewed because he was the complaining party," and "Mr. Maikovich has not been retaliated against."  On April 17, 2019, Maikovich hand delivered a Public Access to Information and Records Rules ("PAIRR") request to the SCAO signed by Plaintiff Brown requesting documents related to the EEOC and CCRD charges.  SCAO front desk receptionist Madelyn Schwenn was physically present at the Ralph Carr Judicial Center.  When Maikovich saw Schwenn, he told her he had a document he needed to give her; Schwenn told him to leave it on her desk and she would pick up the document when she returned to her desk.  At her return, Schwenn found a document on her keyboard (or close thereto) and assumed it was the one Maikovich had described, *i.e.*, Plaintiff Brown's PAIRR request.

On April 19, 2019, at approximately 8:00 a.m., Schwenn brought the document to Maikovich's office and asked him, "What do you want me to do with this again?"  Maikovich replied with words to the effect of, "Maddie, I'm on the opposite side of a legal issue I'm having with the office. So I'm not someone who you probably should listen to. But as a friend, you cannot go wrong if you take it to the legal department."  According to a Chief Justice Directive and departmental rules, SCAO is required to respond within three business days of receipt of a PAIRR request.  However, an April 25, 2019 letter to Plaintiff Brown, signed by Terri Morrison, Legal Counsel, states that Morrison would officially respond to the PAIRR request by May 6, 2019.  In addition, the letter states, "Although the request appears to have been delivered on April 17, 2019, the full-time receptionist was not in the office that day and when she returned to the office, she

found the request on her desk. Because the request was not addressed to a particular person it took some time for her to determine to whom it should be directed, so I did not receive it until Monday, April 22."

On April 30, 2019, Maikovich hand delivered a complaint to the office of Chief Justice Nathan Coats stating that SCAO failed to comply in a timely manner with Brown's PAIRR request and that Morrison had made a factual misrepresentation regarding the deadline for responding to Brown. The following day, May 1, 2019, Ryan hand delivered a written response "on behalf of" Chief Justice Coats to Maikovich, in which Chief Justice Coats did not indicate whether Morrison's reply to Brown's PAIRR request was timely and did not address Maikovich's allegation that Morrison made a factual misrepresentation regarding the receipt of Brown's PAIRR request.

On May 3, 2019, Maikovich hand delivered a letter to Ryan thanking Chief Justice Coats for his May 1 response and directly asking both Ryan and Chief Justice Coats whether they believed that Morrison had complied with the time requirements for responding to a PAIRR request.  Neither responded.  On May 6, 2019, Morrison emailed Brown a response to her PAIRR request, listing which records were available, unavailable, redacted, and withheld, and informing Brown it would cost $726.75 to receive copies of the available documents. On May 15, 2019, Maikovich hand delivered to Morrison a check in the amount of $726.75 for copies of the PAIRR documents.  In return, Morrison gave Maikovich a folder of documents and asked that he give them to Brown.

The Colorado Judicial Department's Anti-Harassment and Anti-Discrimination Policy (the "Policy") states: "Discrimination . . . includes treating someone unfavorably because the person is married to or otherwise associated with a person of a certain race, color, national origin, gender, age, sexual orientation, gender identify, religion, socioeconomic status or disability."  Plaintiffs assert that, as an employee of SCAO, Maikovich is protected by the Policy and, if he files a complaint of

discrimination, he has a right to the protections listed in the Policy.  However, SCAO does not possess a complaint signed by Maikovich.  Prior to its April 10, 2019 Position Statement to the EEOC, SCAO did not possess any document that lists or describes Maikovich as a "complainant" to a charge of discrimination or in any action, nor did any individual employed by the Judicial Branch inform Maikovich in writing or verbally that he was the "complaining party'" or a "complainant."  The first time Maikovich was described as a "complainant" in any official Judicial Branch document was in the SCAO's April 10, 2019 Position Statement. To date, no individual employed by the Judicial Branch has ever advised Maikovich that an investigation was completed on a charge and/or complaint filed by him.  In its April 10, 2019 Position Statement, SCAO wrote, in part, "Mr. Maikovich is asserting that the Department's process to  follow its policy after learning of claimed discrimination is support for a retaliation claim, likely because Mr.  Maikovich did not receive the response he expected."

Plaintiff Brown has never filed a formal charge or complaint with Human Resources at SCAO.  The Judicial Branch is unaware of any individual employed by SCAO Human Resources who has spoken to Brown about her failure to be hired by the Colorado Supreme Court.  To date, no individual employed by the Judicial Branch has ever (1) advised Brown that an investigation was performed or completed on a charge and/or complaint filed by her; (2) provided Brown either in writing or verbally with the results of any investigation performed or completed regarding the hiring of a Rules Attorney; or (3) provided Brown either in writing or verbally with the results of any investigation performed or completed regarding any position.

In early May 2019, the State Auditor informed Chief Justice Coats that the Auditor's office had received allegations meriting formal investigation of fraud at the highest levels of the SCAO.  Chief Justice Coats requested that the State Auditor conduct a statutory fraud investigation.

On or about May 28, 2019, the Judicial Branch awarded Macias, Deputy State Court Administrator, the Judicial Excellence Award as the Collaborative Leader of the Year.  On or about July 18, 2019, Ryan resigned as State Court Administrator.  Plaintiffs contend Ryan was asked to resign by one or more members of the Colorado Supreme Court because of information that was uncovered by state auditors.  That same day, the Colorado Supreme Court terminated Macias' $2.5 million sole-source contract to provide leadership service training to the Judicial Branch.  According to Plaintiffs, at the time the contract was executed, Chief Justice Coats was aware that it was a sole-source contract.  Following the contract's termination, Chief Justice Coats wrote an email to SCAO employees with words to the effect that the contract was terminated because Macias had secretly taped a conversation with then-Chief Justice Nancy Rice regarding Macias' failed application to become the State Court Administrator.  Plaintiffs assert that, during her tenure at the Judicial Branch as HR Director and/or Deputy State Court Administrator, Macias (with the knowledge of one or more SCAO employees) recorded five or more conversations with Judicial Branch employees without their knowledge.

Also on or about July 19, 2019, HR Director Eric Brown resigned his position at SCAO.  Plaintiffs believe that Eric Brown's resignation was prompted by findings made by one or more state audits.  At some time period while working at SCAO, Macias and Eric Brown conducted a private consulting business in which they received monetary remuneration.  Macias was Eric Brown's direct supervisor at all relevant times.  On or about August 22, 2019, SCAO placed acting HR Director Palutke on leave because of findings made by one or more state audits.

In or about the first week of August 2019, a CCRD mediator contacted SCAO and asked whether the office would be interested in mediating Maikovich's discrimination charge.  SCAO responded that it was not interested.  On August 9, 2019, the EEOC issued Plaintiff Brown a Right

to Sue letter with respect to her charge of age and race discrimination. Brown received the letter on August 12, 2019. On September 2, 2019, Plaintiffs sent a "Notice of Intent to Sue" to the Colorado Supreme Court, SCAO, and the Colorado Attorney General's Office. On October 28, 2019, the CCRD issued Maikovich a Right to Sue letter with respect to his charge of disparate treatment and retaliation.

## MOTION TO DISMISS

## I.   LEGAL STANDARDS

### A.   Dismissal under Fed. R. Civ. P. 12(b)(1)

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of subject matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Dismissal under Rule 12(b)(1) is not a judgment on the merits of the plaintiff's case, but only a determination that the court lacks authority to adjudicate the matter. *See Butler v. Kempthorne*, 532 F.3d 1108, 1110 (10th Cir. 2008) (recognizing federal courts are courts of limited jurisdiction and "there is a presumption against our jurisdiction"). A court lacking jurisdiction "must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking." *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1016 (10th Cir. 2013). A motion to dismiss under Rule 12(b) "admits all well-pleaded facts in the complaint as distinguished from conclusory allegations." *Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir. 2001). The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *See Pueblo of Jemez v. United States*, 790 F.3d 1143, 1151 (10th Cir. 2015). Accordingly, Plaintiffs bear the burden in this case of establishing that this Court has jurisdiction to hear their claims.

Generally, Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction take two forms. *Holt v. United States*, 46 F.3d 1000, 1002 (10th 1995).

First, a facial attack on the complaint's allegations as to subject matter jurisdiction

questions the sufficiency of the complaint. In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true. Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

*Id.* at 1002–03 (citations omitted); *see also Pueblo of Jemez v. United States*, 790 F.3d 1143, 1148 n.4 (10th Cir. 2015). The present motion launches a facial attack on this Court's subject matter jurisdiction; therefore, the Court will accept the Complaint's factual allegations as true for its Rule 12(b)(1) analysis.

## B.   Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 679. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

14

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id*. (quotation marks and citation omitted).

## C.    Treatment of a Pro Se Plaintiff's Complaint

The Supreme Court has directed courts to hold *pro se* litigants' pleadings "to less stringent standards than formal pleadings drafted by lawyers." *Tatten v. City & Cty. of Denver*, 730 F. App'x 620, 623 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 826, 202 L. Ed. 2d 579 (2019) (quoting *Haines*

15

*v. Kerner*, 404 U.S. 519, 520 (1972)).  The Tenth Circuit interpreted the *Haines* rule to mean "that if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so." *Id.* (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1110 & n.3 (10th Cir. 1991)). In this case, the Plaintiffs are proceeding *pro se*; however, the allegations taken as true can be reasonably construed to reveal that Plaintiff Brown is an attorney.  Compl. ¶¶ 1, 3-6.  The Tenth Circuit "has repeatedly declined to extend the benefits of liberal construction to pro se pleadings filed by attorneys who have chosen to represent themselves." *Tatten*, 730 F. App'x at 624 (citations omitted).  In addition, the Tenth Circuit instructs that courts must "hold pro se litigants to the requirements of the Federal Rules." *Clark v. Time, Inc.*, 727 F. App'x 975, 978 (10th Cir. 2018).

With these legal standards in mind, the Court will extend to Plaintiff Maikovich the liberal construction of his claims that is provided to *pro se* litigants, but will not extend such construction to Plaintiff Brown.  Even if it did, however, the Court finds both Plaintiffs do not meet their burden to demonstrate the Court has jurisdiction over a portion of their third claim and, otherwise, "to present sufficient facts to state [ ] legally cognizable" second, third, and fourth claims for relief. *See Tatten*, 730 F. App'x at 624.

## II.    ANALYSIS

Defendant argues that Plaintiffs fail to allege plausible claims for retaliation alleged by Maikovich (second claim), violations of Colo. Rev. Stat. § 13-90-107 and the U. S. Constitution (third claim), and breach of contract or promissory estoppel alleged by Maikovich (fourth claim). In addition, Defendant contends the Court lacks jurisdiction to hear Plaintiffs' third claim for relief. The Court will address each claim and the parties' arguments as presented.

A.      **Second Claim for Relief**

Plaintiffs allege that Defendant "engaged in disparate treatment[4] and/or retaliation in violation of [CADA,] Title VII and the ADEA against Ms. Brown's husband, Mr. Maikovich, after he informed them of his wife's concerns about the Supreme Court's hiring practices." Compl. ¶¶ 177, 178.   Defendant argues that Maikovich fails to allege an "adverse employment action" sufficient to state his claim for retaliation.

As relevant here, Title VII of the Civil Rights Act of 1964, as amended, prohibits discrimination and retaliation because of an individual's association with someone in a protected category—in this case, race. *See Salemi v. Colorado Pub. Employees' Ret. Ass'n*, 176 F. Supp. 3d 1132, 1144–45 (D. Colo. 2016), *aff'd*, 747 F. App'x 675 (10th Cir. 2018).  To prove his Title VII claim, Maikovich may utilize direct or circumstantial evidence; if circumstantial, courts engage in the *McDonnell-Douglas* burden-shifting framework to adjudicate the claim.  *See id*.  That is, an employee must first "make out a *prima facie* case of retaliation by showing '(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.'" *Estate of Bassatt v. Sch. Dist. No. 1 in the City & Cty. of Denver*, 775 F.3d 1233, 1238 (10th Cir. 2014) (quoting *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008)).  Once the employee establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse

_____

[4]In their Response, Plaintiffs clarify this allegation and characterize the first claim for relief as "disparate treatment" and the second through fourth claims for relief as "protected activity."  Resp. 6.  In addition, Plaintiffs allege that on March 1, 2019, "Maikovich filed a charge of discrimination . . . alleging harassment and/or discriminatory terms and conditions of employment *based on retaliation for engaging in protected activity*." Compl. ¶ 86 (emphasis added).  Thus, the Court construes the Second Claim as a claim for unlawful retaliation.

action.  *Id.*  If the employer does so, the burden shifts back to the employee to show that there is a genuine issue of material fact as to whether the employer's proffered reasons are pretextual.  *Id.* (citing *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1307 (10th Cir. 2005)).  This test is also used to adjudicate retaliation claims under the Age Discrimination in Employment Act ("ADEA") and Colorado Anti-Discrimination Act ("CADA").  *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 638 (10th Cir. 2012) (ADEA); *Agassounon v. Jeppesen Sanderson, Inc.*, 688 F. App'x 507, 509, 511 (10th Cir. 2017) (CADA); *see also Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1219 n.11 (10th Cir. 2010) (citing *Colo. Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 399-400 (Colo. 1997) (adopting the burden-shifting framework of *McDonnell Douglas* in analyzing state employment discrimination claims under CADA).

In the Tenth Circuit, the "longstanding rule . . . has been to liberally define the phrase adverse employment action" and not limit the term to "monetary losses in the form of wages or benefits." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032 (10th Cir. 2004) (internal quotation marks and alterations omitted); *see also Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998). The term "adverse employment action" includes those acts that "constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," but the term is not limited to such acts. *Hillig*, 381 F.3d at 1032-33 (citations omitted). In determining whether an action is materially adverse, the Tenth Circuit takes a case-by-case approach and requires that the action "be materially adverse to the employee's job status," and "allow[s] a plaintiff to show materiality other than by showing a tangible employment action." *Equal Emp't Opportunity Comm'n v. JBS USA, LLC*, 339 F. Supp. 3d 1135, 1176 (D. Colo. 2018) (emphasis, citations, and internal quotation marks omitted).

To be materially adverse for a retaliation claim, an action must be sufficient to "dissuade [ ] a reasonable worker from making or supporting a charge of discrimination." *Daniels*, 701 F.3d at 638 (citation omitted). This requires injury rising to a "level of seriousness." *Id.* (quoting *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087 (10th Cir. 2007)). Thus, an adverse employment action does not include "a mere inconvenience or an alteration of job responsibilities." *Sanchez*, 164 F.3d at 532. "While the employer's conduct need not affect the terms and conditions of employment, the inquiry is an objective one, and not based on a 'plaintiff's personal feelings.'" *Daniels*, 701 F.3d at 638 (citations omitted).

With respect to the second claim, Plaintiffs argue[5] that Defendant improperly contends the Court lacks jurisdiction to adjudicate the claim. Resp. 13. However, Defendant's jurisdictional arguments apply only to Plaintiffs' third claim; the Court will address those below. Otherwise, Plaintiffs rely on their allegations surrounding Maikovich's meeting with administration (Ryan and Macias), at which he informed them of Plaintiff Brown's intention to file a charge with the EEOC, and the investigation that ensued. *Id.* at 14-15. Plaintiffs contend that the investigation "violat[ed] multiple provisions of Defendant's Anti-Harassment and Anti-Discrimination Policy" and serves as an adverse employment action, in that Defendant "required" Maikovich to "fully cooperate" and Defendant used the investigation to "harass" and "intimidate" both Maikovich and Brown. *Id.* at 15. Specifically, Plaintiffs assert that by requiring Maikovich to cooperate with the investigation,

---

[5]Notably, Plaintiffs spend a good portion of their response brief arguing the merits of their claims—that is, citing the Answer, Plaintiffs contend that Defendant "lacks knowledge," is "admittedly uninformed," or has "made a material misrepresentation" to them or to the Court concerning the facts this case. Resp. 6-11. However, as Plaintiffs acknowledge, the purpose of the present motion is not to argue the merits of Plaintiffs' claims but, rather, to challenge whether Plaintiffs' allegations are sufficient to state plausible claims for relief. The Court will direct its focus accordingly and, to the extent Plaintiffs' arguments are meant to support their motion for sanctions, the Court will address that motion below.

Defendant violated his "First Amendment right to marital privacy and contract rights as an employee." *Id.*

Defendant replies that the undisputed facts reveal "Maikovich brought forward Brown's concerns and, at the time, responded to interview questions without objection." Reply 5-6. Defendant argues that its "attempt to investigate Plaintiffs' concerns [cannot] constitute a materially adverse action towards Maikovich" and "had [Defendant] taken no action to address Plaintiffs' complaint of discrimination in hiring, [it] would be susceptible for violating a duty to investigate such claims." *Id.* at 6.

Again, the Tenth Circuit requires that challenged conduct be "materially adverse to an employee's job status." Plaintiffs contend that Defendant's interview of Maikovich, apparently in furtherance of an investigation into the information Maikovich provided regarding Brown's intent to file an EEOC charge, violated both his First Amendment "privacy right" and his contract of employment.

While an alleged unlawful action might possibly serve as an "adverse employment action" under certain circumstances, the Court is not persuaded that Maikovich's interview was "adverse" for purposes of a retaliation claim because the interview allegedly "violated the First Amendment." First, Plaintiffs do not explain how any imposition into their "marital privacy" affects (or affected) Maikovich's employment or job status. *See Lucas v. Office of Colorado State Pub. Def.*, 705 F. App'x 700, 705 n.1 (10th Cir. 2017) (rejecting as an "adverse employment action" a corrective action that allegedly violated plaintiff's constitutional freedom of association to interact with co-workers and to pursue intimate human relationships). Second, as discussed below in Section C analyzing Plaintiffs' third claim for relief, Plaintiffs do not state a plausible First Amendment or other constitutional claim in this action. *See id.* (rejecting the same corrective action as allegedly

violating plaintiff's due process rights for plaintiff's failure to assert a due process claim in his complaint).

As for whether the interview violated Maikovich's employment contract, Maikovich's allegations are vague and somewhat difficult to discern, but the Court liberally construes them as raised in his fourth claim for relief.  Apparently, Maikovich contends that Defendant's characterization of him as a "complainant" under its Anti-Harassment/Anti-Discrimination Policy when it responded to Maikovich's CCRD charge is a "pretext for discrimination" and a violation of the Policy, since he never actually filed a formal complaint with Defendant.  Compl. ¶ 181.  For the reasons set forth below in its Rule 12(b)(6) analysis of Maikovich's fourth claim, the Court finds he fails to state a claim for relief and, thus, an alleged breach of contract may not be used to demonstrate that the interview was "materially adverse" for purposes of establishing Maikovich's second claim for relief.

Even if such a "breach" were sufficient to state a claim, the Court finds Plaintiffs fail to demonstrate the "level of seriousness" necessary to show adversity—*i.e.*, that Defendant's characterization of Maikovich as a "complainant" in a CCRD proceeding would "dissuade a reasonable worker from making or supporting a charge of discrimination." *See Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087 (10th Cir. 2007) (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 67 (2006)).  Taking the allegations as true, the Court finds the characterization, made by Defendant in an EEOC response to Maikovich's charge of discrimination, without more, would not dissuade a reasonable worker from supporting a charge of discrimination, and there is no indication in this case that Maikovich was dissuaded from proceeding with his charge of discrimination after he was characterized by Defendant as a "complainant."  Therefore, because Plaintiffs fail to state a plausible claim that Maikovich suffered an adverse employment action, the

Court will grant Defendant's motion to dismiss the second claim.

### B.     Fourth Claim for Relief

Having just referred to Maikovich's fourth claim, the Court will proceed to analyze its sufficiency next.  Plaintiffs allege, "By failing to follow the rules afforded to employers within the Judicial Branch, the Office of the State Court Administrator violated the contract rights of an employee, Andrew Maikovich."  Compl. ¶ 184.  Again, the allegations on which Plaintiffs rely for this claim involve an April 10, 2019 position statement filed by Defendant with the CCRD in response to Maikovich's charge of discrimination.  Plaintiffs allege, "In its Position Statement to the CCRD, SCAO stated in part: Mr. Maikovich's [sic] Was Interviewed Because He Was the Complaining Party . . . ."  Compl. ¶ 88.  Plaintiffs also allege that Maikovich never filed a formal complaint with Defendant, and that Defendant knows Maikovich never filed any complaint.  *Id.* ¶¶ 122-131.  Plaintiffs argue, however, that "[a]s an employee of SCAO, *if* Mr. Maikovich files a complaint of discrimination, he has a right to the protections listed in [the] Anti-Harassment and Anti-Discrimination Policy"—*i.e.*, "a fair and complete investigation, appropriate action being taken, and to be free from retaliation."  *Id.* ¶¶ 120-121 (emphasis added).  Taking the allegations as true and construing them liberally, Plaintiffs allege Maikovich did not receive these protections from Defendant and, thus, Defendant breached the Policy.

Claim Four fails for several reasons.  First, the Plaintiffs have not demonstrated that an employer's policy may serve as a "contract" or a "promise" outside of Colorado's exception to the at-will employment doctrine: "an at-will employee might be able to enforce *termination procedures* in an employee handbook under an implied contract or a promissory estoppel theory in some circumstances."  *Trujillo v. Atmos Energy Corp.*, 896 F. Supp. 2d 949, 955 (D. Colo. 2012) (citing *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711–12 (Colo. 1987) and *George v. Ute Water*

*Conservancy Dist.*, 950 P.2d 1195, 1198 (Colo. App. 1997)) (emphasis added).  Plaintiffs cite to

*Dickey v. Adams Cty. Sch. Dist.*, 791 P.2d 688 (Colo. 1982), but like the other cases cited, *Dickey*

involved the defendant's employment termination procedures.  *Id.* at 694.  Here, Plaintiffs do not

challenge Defendant's "termination procedures," but rather its Anti-Discrimination Policy.

Second, "[u]nder an implied contract theory, a discharged employee must first show that in

promulgating an employment manual or policy, the employer was making an offer to the

employee—'that is, the employer manifested his willingness to enter into a bargain in such a way

as to justify the employee in understanding that his assent to the bargain was invited by the employer

and that the employee's assent would conclude the bargain.'"  *Vasey v. Martin Marietta Corp.*, 29

F.3d 1460, 1464 (10th Cir. 1994) (quoting *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711

(Colo. 1987)).  However, in Colorado, an equal employment opportunity statement or policy, which

neither contains nor emphasizes "personnel decisions involving compensation," appears to be

insufficient to constitute a contractual offer.  *Id.* at 1465 (citing *Stahl v. Sun Microsystems, Inc.*, 19

F.3d 533, 536 (10th Cir. 1994)); *see also id.* (citing *Tuttle v. ANR Freight System, Inc.*, 797 P.2d

825, 827 (Colo. App. 1990) for the proposition that there was no indication the Colorado court

would find an anti-discrimination policy, "absent detailed salary and wage guidelines," to be

sufficient evidence to support a finding of an implied contract); *Peru v. T-Mobile USA, Inc.*, 897 F.

Supp. 2d 1078, 1086 (D. Colo. 2012) (". . . it appears to the Court that a contract or quasi-contract

claim premised on a promise not to violate federal anti-discrimination law is effectively subsumed

by the statutory claim itself and is not separately cognizable."); *Demarah v. Texaco Grp., Inc.*, 88

F. Supp. 2d 1150, 1158 (D. Colo. 2000) (". . . the EEOC policy statement incorporated in the

Manual that '[defendant] provides equal employment opportunity for all employees "without regard

to ... sex, ... disability,"' . . . constitutes an indefinite assurance that cannot be enforced under the law

of contract or promissory estoppel."); *cf. Pascouau v. Martin Marietta Corp.*, 994 F. Supp. 1276, 1282 (D. Colo. 1998) ("The company's policy statements [concerning reporting and resolving issues of harassment] are no more than a restatement[] of its legal obligations imposed by statute.").

Third, even if Colorado recognized an implied contract or promissory estoppel claim for violation of any employment policy, "the injured party must demonstrate that he has acted or foregone some action because he reasonably relied on some promise made to him." *Trujillo*, 896 F. Supp. 2d at 954 (D. Colo. 2012) (addressing a promissory estoppel claim based on alleged violations of anti-discrimination and safety policies); *see also Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008) ("[t]he elements of a promissory estoppel claim are: (1) the promisor made a promise to the promisee; (2) the promisor should reasonably have expected that the promise would induce action or forbearance by the promisee; (3) the promisee in fact reasonably relied on the promise to the promisee's detriment; and (4) the promise must be enforced to prevent injustice."). Here, Maikovich fails to allege how he reasonably relied on the protections of the Policy to his detriment.

For instance, the Plaintiffs concede that Maikovich was not entitled to the protections of the Policy; thus, he could not have "reasonably" relied on the Policy. It is undisputed that, to be entitled to the Policy's protections, an employee must have filed a complaint under the Policy. The allegations taken as true reflect that Maikovich was "required to fully cooperate" with an investigation by participating in an interview on September 6, 2018. Compl. ¶ 66. The HR Manager who directed Maikovich to this interview stated: "The State Court Administrator's Office Human Resources Division has received a complaint and will be looking into this matter further. As part of the review, it is our understanding that you may have pertinent information that could assist us in our investigation." *Id.* There is no mention of Maikovich as the "complainant" or "complaining

party" in this communication or at any time before his interview.

Furthermore, Maikovich asserts in ten separate allegations that Defendant does not possess a complaint or any document containing a complaint signed by him; no one at Defendant requested he sign such complaint or document; and no one informed him he was a "complainant." Compl. ¶¶ 122-131. Rather, as Maikovich concedes, the *only* time he is characterized as a "complainant" is in the Defendant's written response to the CCRD charge, seven months after the interview. *Id.* ¶¶ 126, 181. Importantly, Maikovich fails to articulate what action he took or chose not to take in reasonable reliance on the terms in the Anti-Discrimination Policy following the Defendant's characterization. Moreover, he fails to allege Defendant "manifested his willingness to enter into a bargain" when it characterized him as a "complainant." He only alleges that *if* he were a "complainant," he would be entitled to certain protections under the Policy. This is insufficient to state a plausible claim for breach of implied contract or promissory estoppel. The Court will grant Defendant's motion to dismiss Plaintiffs' fourth claim for relief.

### C.     Third Claim for Relief

For their third claim, Plaintiffs allege: "By requiring Mr. Maikovich to answer questions regarding confidential conversations he had with his wife in the privacy of their home, the Office of State Court Administrator violated C.R.S. § 13-90-107, as well as state and federal constitutional rights of association and marital privacy." Compl. ¶ 180. Defendant seeks dismissal of this claim arguing Plaintiffs have no private right of action under the Colorado statute, Defendant is not a person for purposes of the constitutional claims brought pursuant to 42 U.S.C. § 1983, and to the extent the claim may be construed as asserting a common law tort, Defendant is immune from suit pursuant to the Colorado Governmental Immunity Act ("CGIA").

First, Plaintiffs do not respond meaningfully to Defendant's argument that they lack standing

to assert the third claim because Colo. Rev. Stat. § 13-90-107 creates no private right of action. Article III of the United States Constitution provides that federal courts only have jurisdiction to hear certain "'Cases' and 'Controversies.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (quoting U.S. Const. art. III, § 2). "To satisfy Article III's case-or-controversy requirement, a plaintiff must demonstrate standing to sue by establishing '(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision.'" *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 543 (10th Cir. 2016) (quoting *Driehaus*, 573 U.S. at 157-58) (internal quotation marks and brackets omitted). Defendant asserts that Plaintiffs fail to demonstrate the third prong, since the state statute does not provide a remedy for a private claim.

The Court finds nothing in Colo. Rev. Stat. § 13-90-107 nor the applicable case law demonstrating that a spouse has a right to bring a civil lawsuit under the statute against a party alleged to have required the spouse to reveal confidences shared between two spouses. Section 13–90–107(1)(a)(I) provides, in pertinent part, that:

> a husband shall not be examined for or against his wife without her consent nor a wife for or against her husband without his consent; nor during the marriage or afterward shall either be examined without the consent of the other as to any communications made by one to the other during the marriage . . . .

The testimonial provisions of the statutory marital privilege are "designed to protect the sanctity and tranquility of the marital relationship from the disruption attendant to adverse spousal testimony." *Petro-Lewis Corp. v. Dist. Court, Fourth Judicial Dist., El Paso Cty.*, 727 P.2d 41, 43 (Colo. 1986) (citations omitted). The statute is found under Title 13, governing Colorado's courts and court procedure and Article 90, governing witnesses in such proceedings. According to the Colorado Supreme Court, "the testimonial privilege applies to in-court testimony, as well as depositions,

26

interrogatories, requests for admissions, and other forms of *testimonial* discovery." *Id.* (citations

omitted) (emphasis added).  Thus, while a person may invoke the privilege for protection against

adverse spousal testimony, nothing in the statute or case law interpreting it construe a private right

of action for recovery of damages.  Even if a cause of action exists under the statute, however, the

Plaintiffs cite, and the Court has found, no cases interpreting the statute to apply to the provision of

information by a witness for an internal investigation, particularly when there is no allegation or

other indication that the witness provided the information under oath.[6]  Therefore, taking the

allegations as true, the Court finds Plaintiffs fail to demonstrate they have standing to raise a claim

under Section 13-90-107.

To the extent that Plaintiffs allege a violation of their First Amendment rights to " marital

privacy"[7] in their third claim for relief, such claim must arise pursuant to 42 U.S.C. § 1983, which

provides a cause of action for damages incurred as a result of a constitutional violation.  Defendant

asserts that it is not a "person" within the meaning of Section 1983 and, thus, Plaintiffs fail to state

plausible constitutional claims.  Mot. 11 (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58,

64 (1989)).  Plaintiffs counter that Defendant may not rely on Eleventh Amendment immunity

because Defendant waived such immunity when it removed the case to this Court.  Resp. 16 (citing

*Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613 (2002)).

Plaintiffs are partially correct; a state defendant, which voluntarily removes a case to federal

---

[6]Black's Law Dictionary defines "testimony" as "evidence given by a witness, under oath or affirmation."  *See* https://thelawdictionary.org/testimony/, last visited May 26, 2020.

[7]The Tenth Circuit has described "the familial right of association," which "is consonant with the right of privacy" as "based on the 'concept of liberty in the Fourteenth Amendment.'" *Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993) (citations omitted).  However, whether the third claim is raised pursuant to the First Amendment or the Fourteenth Amendment, it must be adjudicated pursuant to Section 1983.

court, waives its Eleventh Amendment immunity as to certain federal claims (except those seeking recovery under 42 U.S.C. § 1983) and to state-law claims pending in federal court under the court's supplemental jurisdiction.  *See Lapides*, 535 U.S. at 617; *see also Estes v. Wyoming Dep't of Transp.*, 302 F.3d 1200, 1206 (10th Cir. 2002) (state defendant waived its sovereign immunity from a federal (ADA) claim and a state (breach of contract) claim by removing the case from state court to federal court).  In *Lapides*, the Supreme Court did not find waiver with respect to the plaintiff's only federal claim against the state defendant as it "[arose] under 42 U.S.C. § 1983 [and sought] only monetary damages, and we have held that a State is not a 'person' against whom a § 1983 claim for money damages might be asserted." 535 U.S. at 617 (citing *Will*, 491 U.S. at 66).

In this case, Plaintiffs specifically seek "$250,000 [for] Ms. Brown and Mr. Maikovich (combined) for violating their constitutional rights of association and marital privacy." Compl. at 13.  In accordance with *Lapides* and other applicable law, the third claim brought against Defendant pursuant to Section 1983 for violation of Plaintiffs' First and/or Fourteenth Amendment rights must be dismissed.  However, Plaintiffs also seek "[i]njunctive relief to protect the rights of future applicants, employees, and spouses at the Colorado Supreme Court and SCAO." *Id.*  The Court is not convinced that Plaintiffs have standing to seek such relief on behalf of other "applicants, employees, and spouses," particularly as they do not allege such persons are at risk of "real or immediate threat of future harm." *See Big Elk v. Bd. of Cty. Comm'rs of Osage Cty.*, 3 F. App'x 802, 806 (10th Cir. 2001) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983)). Nevertheless, even to the extent their request for injunctive relief were actionable, Plaintiffs have failed to state a claim against a person covered by Section 1983.  *See McLaughlin v. Bd. of Trustees of State Colleges of Colorado*, 215 F.3d 1168, 1172 (10th Cir. 2000) (finding state defendant waived its Eleventh Amendment immunity by removing the case, but concluding that had plaintiff "sued

a state official instead of the [state entity], he could have argued the viability of his claim for prospective injunctive relief . . . [ha]ving failed to do so, however, [plaintiff] is left without a federal claim."). The Court finds Plaintiffs' federal constitutional claims against Defendant must be dismissed.

Plaintiffs also mention a violation of their "state . . . constitutional rights of association and marital privacy" in their third claim. Compl. ¶ 180. However, in Colorado, the marital privilege is not a constitutional right. *See People v. Wickham*, 53 P.3d 691, 697 (Colo. App. 2001) ("defendant has not cited to, nor are we aware of, any case law suggesting that the marital privilege is a constitutional right") (citing *In re Marriage of Bozarth*, 779 P.2d 1346, 1348 (Colo. 1989) (stating that the marital privilege is a "statutory privilege") and *People v. Thompson*, 950 P.2d 608 (Colo. App. 1997) (stating that the marital privilege developed from the common law without reference to any constitutional rights)).

Finally, Defendant asserts that, to the extent Plaintiffs' third claim may be construed as a state-law tort, the claim is barred by the CGIA. Other than argue that "SCAO's ability to conduct any type of independent investigation of the Colorado Supreme Court is rife with a conflict of interest" (Resp. 17-18), Plaintiffs do not respond to Defendant's argument. The Court agrees that Plaintiffs' claim, construed as a common law tort, would be statutorily barred.

"Whether a public entity is protected by sovereign immunity under the Colorado Governmental Immunity Act . . . is an issue of subject matter jurisdiction." *Rooker v. Ouray Cty.*, 841 F. Supp. 2d 1212, 1215 (D. Colo.), *aff'd*, 504 F. App'x 734 (10th Cir. 2012) (citing Swieckowski by Swieckowski v. City of Fort Collins, 934 P.2d 1380, 1383–84 (Colo.1997)). Pursuant to the CGIA, public entities are immune from liability in all claims for injury that lie in tort or could lie in tort, unless the claim falls within an exception to that immunity. *Robinson v.*

29

*Colorado State Lottery Div.*, 179 P.3d 998, 1003 (Colo. 2008).  The CGIA, Colo. Rev. Stat. § 24–10–106(1), provides: "A public entity shall be immune from liability in all claims for injury which lie in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by the claimant except as provided otherwise in this section." *See id.*  Plaintiffs do not argue that their claim for violation of their rights to privacy falls within any exception listed in the statute. *See Curtis v. Hyland Hills Park & Recreation Dist.*, 179 P.3d 81, 83 (Colo. App. 2007) ("the plaintiff has the burden of proving jurisdiction and demonstrating that governmental immunity has been waived."). Accordingly, Defendant enjoys sovereign immunity under the CGIA from any such claim construed as a state-law tort. *See Robinson*, 179 P.3d at 1003.

In sum, the Court will grant Defendant's motion to dismiss Plaintiffs' third claim for relief against Defendant, construed as raising both federal and state constitutional claims, a state statutory claim, and a possible state tort claim.

## MOTION FOR SANCTIONS

With their response to the Motion to Dismiss, Plaintiffs also filed a Motion for Sanctions referring generally to their response and arguing (in its entirety): "Plaintiffs request that this Court impose sanctions upon Defendant's counsel in such form and amounts as the Court in its sole discretion deems appropriate under all the circumstances involved in this matter." Mot., ECF 14. The Court was authorized to strike or deny the motion without prejudice for Plaintiffs' failure to comply with D.C. Colo. LCivR 7.1(d) ("a motion involving a contested issue of law shall state under which rule or statute it is filed and be supported by a recitation of legal authority in the motion"); however, Plaintiffs certified that they conferred with Defendant about the motion and, thus, the Court allowed it to proceed.  Unfortunately, the Defendant also noted the motion's lack of information and "presumed" that Plaintiffs' request for sanctions was brought "under Fed. R. Civ.

P. 11 and 28 U.S.C. § 1927" based "on grounds that they believe Judicial and its counsel multiplied the proceedings in this case 'unreasonably and vexatiously." Resp. 1.  In their Reply, Plaintiffs do not confirm Defendant's presumption but, rather, after setting forth specific grounds on which they believe sanctions are appropriate, state that they seek attorney's fees pursuant to Colo. Rev. Stat. § 13-17-102.

A reasonable construction of the motion and reply reveal that Plaintiffs seek sanctions pursuant to subsection (4) of Colo. Rev. Stat. § 13-17-102, which provides:

> The court shall assess attorney fees if, upon the motion of any party or the court itself, it finds that an attorney or party brought or defended an action, or any part thereof, that lacked substantial justification or that the action, or any part thereof, was interposed for delay or harassment or if it finds that an attorney or party unnecessarily expanded the proceeding by other improper conduct, including, but not limited to, abuses of discovery procedures available under the Colorado rules of civil procedure or a designation by a defending party under section 13-21-111.5(3) that lacked substantial justification. As used in this article, "lacked substantial justification" means substantially frivolous, substantially groundless, or substantially vexatious.

Colo. Rev. Stat. § 13-17-102(4).  The Supreme Court has interpreted this statute and found that "a court 'shall assess' attorney fees if it finds that an attorney unnecessarily expanded the proceeding by abusing the rules of discovery." *In re Marriage of Wiggins*, 279 P.3d 1, 10 (Colo. 2010).

Importantly, several courts in this District have "consistently found that [the] safe-harbor provision [of Fed. R. Civ. P. 11] preempts C.R.S. § 13-17-102 and that therefore, failure to comply with the safe-harbor provision bars a motion for attorney's fees pursuant to C.R.S. § 13-17-102." *Dowling v. Gen. Motors LLC*, 333 F.R.D. 534, 538 (D. Colo. 2019) (collecting cases).  This Court agrees and finds that section 13-17-102 is "merely a procedural statute regarding sanctions based

on conduct in the litigation" and not substantive law for purposes of the *Erie* doctrine.[8]  *Id.* (citing

*Hach Co. v. In-Situ, Inc.*, No. 13-cv-02201-CBS, 2016 WL 9725765, at *10-11 (D. Colo. Nov. 22,

2016); *see also Kazazian v. Emergency Serv. Physicians, P.C.*, 300 F.R.D. 672, 677 (D. Colo. 2014)

("Colorado courts characterize § 13-17-102 as a sanction, rather than a substantive right.") (citing

*City of Aurora ex rel. Utility Enterprise v. Colo. State Engineer*, 105 P.3d 595, 618 (Colo. 2005)

("An award of attorney fees [under § 13-17-102] is an important sanction against an attorney or

party who improperly instigates or prolongs litigation.")).  The Court finds any request for sanctions

for improper litigation conduct in this case is governed by Fed. R. Civ. P. 11 rather than by Colo.

Rev. Stat. § 13-17-102, and, therefore, will construe Plaintiffs' motion as brought pursuant to Rule

11.

Rule 11 provides, in pertinent part:

(c) Sanctions. If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

(1) How Initiated.

(A) By Motion. A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected. If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion. * * *

_____

[8] The Erie doctrine provides that, in cases involving state law claims, a federal court applies the substantive law of the forum state, but ***federal*** procedural law and rules for procedural matters.  *See Scottsdale Ins. Co. v. Tolliver*, 636 F.3d 1273, 1277 (10th Cir. 2011); *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) (discussing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

Fed. R. Civ. P. 11(c).  The Court finds first that Plaintiffs failed to comply with Fed. R. Civ. P. 11(c)(1)(A) by failing to "describe the specific conduct alleged to violate subdivision (b)" in their motion.  Second, while Plaintiffs *do* describe the allegedly sanctionable conduct in their Reply, the Defendant has had no opportunity to respond and there is no indication that Plaintiffs complied with Rule 11's safe-harbor provision; *i.e.*, informed Defendant of the challenged "specific conduct," then filed their request for sanctions twenty-one days after Defendant failed to "withdraw[] or appropriately correct[]" such conduct.

As such, the Court will deny the motion for sanctions without prejudice.  If the Plaintiffs choose to re-file their motion, they must do so in accordance with Rule 11 and all applicable law.

### CONCLUSION

The Court concludes that it lacks jurisdiction to hear Plaintiffs' third claim to the extent it seeks recovery under Colo. Rev. Stat. § 13-90-107 and/or states a common law tort.  Otherwise, the Court finds Plaintiffs' allegations fail to state plausible second and fourth claims for relief, as well as a plausible third claim to the extent it asserts violations of Colorado's constitution.  With respect to Plaintiffs' federal constitutional claims asserted in the third claim, the Court finds Defendant is not a "person" under 42 U.S.C. § 1983 and, thus, the claims are dismissed.  Moreover, Plaintiffs' request for sanctions pursuant to Colo. Rev. Stat. § 13-17-102 is preempted by Fed. R. Civ. P. 11; the Court will grant Plaintiffs leave to re-file the motion in accordance with Rule 11 and all applicable law.

Accordingly, the Defendant's Motion to Dismiss Claims Two, Three, and Four [filed January 15, 2020; ECF 13] is **granted** as set forth herein and Plaintiff's Motion for Sanctions [filed February 5, 2020; ECF 14] is **denied without prejudice**.

SO ORDERED.

Dated this the 2nd day of June, 2020, in Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge