IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-03362-MEH

MICHELE BROWN,

     Plaintiff,

v.

COLORADO JUDICIAL DEPARTMENT,

     Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Defendant Colorado Judicial Department seeks summary judgment on Plaintiff's two claims, race and age discrimination arising from her failure to be selected for a staff attorney position. The parties have submitted extensive materials in support of their respective positions. The Court finds that oral argument will not assist in the motion's adjudication. Because the evidentiary record does not demonstrate any material issues of fact supporting discrimination, Defendant's motion is granted.

## <u>FINDINGS OF FACT</u>

I make the following findings of fact viewed in the light most favorable to Ms. Brown, who is the non-moving party in this matter. Some of the facts proffered by Defendant, and most of the facts proffered by Ms. Brown, were not relevant to the material issues in the case, and I have excluded those. Many of the following facts, which were submitted by Defendant, are not discussed in my ruling; however, because the prima facie case of discrimination in hiring

1

requires Ms. Brown to prove that she was "rejected under circumstances which give rise to an inference of unlawful discrimination," *Laul v. Los Alamos Nat'l Lab'ys*, 765 F. App'x 434, 440 (10th Cir. 2019) (see discussion below), I have included them here to provide those circumstances. Further, some of the facts alleged by the parties are not material to my decision but add educational background, while some others I have included and, as appropriate, explain why in brackets. Several of the following facts were not properly contested by Ms. Brown and are, thus, deemed admitted. As to others, Ms. Brown provided a sufficient basis to deny in part, and those facts reflect only what the uncontested record establishes.       1.       The Colorado Judicial Department ("Judicial") is the overarching entity that encompasses the State's judicial system, including the Colorado Supreme Court. Ex. A to Defendant's Motion (Mot.), EEOC Position Statement, p. 1. At the time of the selection process underlying this lawsuit, Ms. Brown was a sixty-three year old African-American female employed by the Colorado General Assembly. Resp. Ex. 13 at 3. The selectee, Kathryn Michaels, was a thirty-five year old white female.

2.       The Colorado Supreme Court is allocated four staff attorney positions to support its work and the work of the Justices of that court. Mot. Ex. B, Declaration of Justice Richard Gabriel at ¶ 6.

3.       In early 2018, those four staff attorneys were Jennifer Wallace, Melissa Meirink, Jeremy Beck, and Jenny Moore. Mot. Ex. C, Declaration of Ms. Wallace at ¶ 11.

4.       In early 2018, three of the four staff attorneys had been hired internally from other positions within Judicial, including Mr. Beck, Ms. Moore, and Ms. Wallace. *Id*. at ¶¶ 2, 3; Mot. Ex. D, Declaration of Mr. Beck at ¶¶ 2, 3; Mot. Ex. E, Declaration of Ms. Moore at ¶¶ 3-6, 8.

5.      At the time Ms. Wallace was hired as a Supreme Court staff attorney, she was over the age of forty. Ex. C at ¶ 5. [Note: Because Plaintiff makes an argument based on statistical and demographic evidence of past hires, I include this].

6.      Ms. Meirink is a person of color, and English is her second language. Mot. Ex. F, Deposition of Ms. Meirink at 6:24-7:1; Mot. Ex. G, Declaration of Ms. Meirink at ¶ 2.

7.      Each of the four staff attorneys has unique, defined responsibilities. Mot. Ex. H, Memorandum from Melissa Meirink to Chris Ryan, dated January 24, 2017; Mot. Ex. G at ¶¶ 6-7; Mot. Ex. D, Declaration of Jeremy Beck at ¶¶ 7-10; Mot. Ex. C at ¶ 7; Ex B at ¶ 6.

8.      The staff attorneys' work is dynamic, and each staff attorney is expected to and does take on additional research and writing assignments, and other projects as needed. Mot. Ex. H; Mot. Ex. D at ¶¶ 11, 12; Mot. Ex. G at ¶ 7, Ex. C at ¶¶ 7-11; Mot. Ex. I, Deposition of Mr. Beck at 11:5-11:8; Mot. Ex. J, Deposition of Ms. Michaels at 44:7-45:3. As to the selectee, Ms. Michaels, the "crux" of her work has stayed the same during her tenure. Response (Resp.) Ex. 1 at 49:8.

***The Rules Committees' Staff Attorney Position and Opening***

9.      Ms. Moore's role as a staff attorney was to provide legal and administrative support to various Supreme Court rules committees, including performing complex legal research related to the rules for committee members, assisting with meeting logistics, attending and acting as the reporter at committee meetings, marking proposed rule changes, and finalizing and distributing the final rules for publication. Mot. Ex. K, Staff Attorney Job Posting at "Additional Comments"; Mot. Ex. E at ¶ 7; Mot. Ex. J at 30:22-31:3.

10. The rules committees review and revise a designated set of court rules – i.e. the Rules of Evidence, Rules of Civil Procedure, etc. – and are composed of practitioners and judicial officers, and typically chaired by a Court of Appeals Judge. Mot. Ex. E, ¶ 5; Mot. Ex. L, Deposition of Justice Gabriel at 75:16-75:20.

11. Ms. Moore's staff attorney position originated in the Colorado Supreme Court Law Library. Mot. Ex. E, at ¶¶ 5, 6, 8; Mot. Ex. J, at 25:11-26:19, 27:4-27:16.

12. When the need for rules committee support arose, the director of the library believed the work was best suited to law librarians, who had the legal research and project management experience necessary to assist the committee members. Mot. Ex. J at 28:6-28:18.

13. Ms. Moore, who was a law librarian at the time, was asked to support the rules committees. Mot. Ex. E, Declaration of Moore at ¶ 5.

14. In 2014, Ms. Moore was reclassified from a law librarian to a Rules Research Attorney for the Colorado Court of Appeals. Mot. Ex. E at ¶ 6.

15. Sometime thereafter, her role was again reclassified to a Colorado Supreme Court staff attorney. *Id.* at ¶ 8; Mot. Ex. J at 27:4-27:16.

16. In early 2018, Ms. Moore accepted another position within Judicial, thus the Supreme Court needed to fill her position. Mot. Ex. E at ¶ 10.

17. On June 30, 2018, then-Chief Justice Nathan Coats asked for Justices to volunteer as quasi-chairs for the staff attorney hiring. Mot. Ex. B at ¶ 7.

18. Justices Gabriel and Hart volunteered. Mot. Ex. B at ¶ 9.

19. Justices Gabriel and Hart worked with the Clerk of Court, Cheryl Stevens, to prepare a description of the staff attorney's job duties to include in a public job posting. Mot. Ex. M, Defendant's First Supplemental Responses to Plaintiff's Requests for Written Discovery, p.

29, Interrogatory No. 3; Mot. Ex. L, 9:7-10:14, 11:11-11:17.

20.     Justice Gabriel and Ms. Stevens spoke with Ms. Moore at least once regarding her job duties. Mot. Ex. J at 100:7-100:25, 203:17-206:2.

21.     During those conversations, Ms. Moore explained that the staff attorney's work supporting the rules committees would likely constitute only about 70% of a full-time position. Mot. Ex. J at 100:7-100:25, 203:17-206:2.

22.     The job posting listed the staff attorneys' primary duties as working with the rules committees as well as the additional responsibilities that might arise. Mot. Ex. K at "Additional Comments," pp. 1-2.

23.     As for the rules committees' work, the post stated:

This position provides legal staff support to the Supreme Court rules committees, including assisting with meeting planning and set-up. Attends committee meetings to act as Reporter, mark proposed rule changes and draft meeting minutes. Facilitate and track proposed changes sent from committees to supreme court. Finalize and distribute approved rules changes for public release/publication.

The staff attorney posts current rules information on the Supreme Court and committee websites, interacts with judicial officers and members of the public, and responds to inquiries pertaining to proposed or adopted rule changes.

The staff attorney also provides legal support to the rules committees, including researching, analyzing, or making recommendations on procedural rules and other forms or policies.

*Id.*

24.     Based on their conversations with Ms. Moore, Justice Gabriel and Ms. Stevens included additional general staff attorney duties that the successful candidate might be expected to perform once in the job – for example, screening and preparing memos on certiorari petitions, making recommendations on motions, drafting orders and opinions, and preparing memos on

legal issues. *Id*. at p. 2; Mot. Ex. L at 9:11-10:14, 95:2-96:5, 107:17-108:8; Mot. Ex. B at ¶ 14.

25.     The reason for including these additional duties was to convey to candidates that the staff attorney would be expected to, among other things, assist the Supreme Court with tasks outside the scope of the rules committees' work. Mot. Ex. L at 186:18-186:25; Mot. Ex. N, Hart Deposition at 44:13-45:11; Mot. Ex. O, Deposition of Stevens at 99:5-100:16.

26.     The job posting listed the position as a full-time (FTE: 1.0) position. Mot. Ex. K at p. 1.

27.     At the time they prepared the posting, Justice Gabriel and Ms. Stevens understood that the rules committees' work would require only approximately 70% of a full-time position; however, the position was listed as 1.0 in part because the interview panel believed that listing the position as .8 FTE (or 32 hours/ week) could limit the applicant pool. Mot. Ex. M, p. 29, Interrogatory No. 3. However, prior to applications being received, Ms. Stevens knew Ms. Michaels was interested in the position on a .8 full-time basis.

28.     The job posting also stated, "Please note that this position requires that the applicant be currently admitted to practice law in Colorado, with an active license, and a minimum of six years of experience in the practice of law as measured by bar admission date. Please see full job description." Mot. Ex. K.

29.     From April 13, 2018 to May 7, 2018, the job posting was open and available on Judicial's website. Mot. Ex. K.

***Communications with Potential Applicants***

30.     Following the public posting for the staff attorney position, potential candidates contacted Justices Gabriel and Hart, and all four then-staff attorneys seeking to learn more about the position and interview process. Mot. Ex. M, pp. 37-38, Interrogatory No. 11; Mot. Ex. N at

158:18-159:25; Mot. Ex. F at 17:5-28:17; Mot. Ex. D at ¶ 14; Mot. Ex. C at ¶ 14; Mot. Ex. E at ¶ 12.

31.     Justice Gabriel spoke with at least four candidates, including three who received interviews (S.D., B.M., and L.N.). Mot. Ex. L at 64:5-65:19; Mot. Ex. B at ¶ 25.

32.     Justice Gabriel answered candidates' questions regarding what the job entailed and, in the context of explaining the job, described attributes the successful candidate would need, for example, organizational skills, attention to detail, and the ability to remain calm in a sometimes frantic committee setting. Mot. Ex. L at 82:20-84:16.

33.     Justice Hart spoke with one candidate who received an interview (S.D.) and shared information such as what the job entailed and what skills the successful candidate would possess. Mot. Ex. N at 158:18-159:25, 162:17-163:22.

34.     Ms. Meirink discussed the position and interview process with potential applicants, including the successful candidate, Ms. Michaels. Mot. Ex. G at ¶¶ 14-15.

35.     Ms. Meirink provided Ms. Michaels with information about the position and the interview process. *Id*.; Mot. Ex. F at 27:16-31:11,42:16-42:24.

36.     Ms. Brown does not contend that Ms. Meirink provided information to candidates in a discriminatory manner, Ex. P, Deposition of Michele Brown at 91:14-91:17, but Ms. Brown does assert that Ms. Meirink's efforts unfairly assisted Ms. Michaels' candidacy.

37.     Mr. Beck spoke with applicant A.G. about the open position. Mot. Ex. I at 16:15-20:6.

38.     Four candidates who received interviews contacted Ms. Wallace: A.G., K.M., B.M., and L.N. Mot. Ex. C at ¶ 14.

39.     Ms. Wallace met with all four in person, including K.M. (not Kathryn Michaels), who was over the age of 40. *Id.* at ¶¶ 15, 16.

40.     Ms. Moore also discussed the staff attorney position with Ms. Michaels. Mot. Ex. Q, Michaels' Cover Letter; Mot. Ex. J at 60:25-61:2; Mot. Ex. E at ¶ 12.

41.     Ms. Brown was familiar with the benefits of networking and the importance of using connections: Ms. Brown applied for a federal clerkship with a judge whom she knew personally because, before taking the bench and hiring Ms. Brown as a clerk, the judge had been Ms. Brown's father's law partner. Mot. Ex. P at 117:22-118:13.

42.     Ms. Brown also obtained another job relying on a personal connection; Ms. Brown was hired to be the special assistant to the U.S. Consumer Product Safety Commission Chair, who was Ms. Brown's friend in college and law school. *Id*. at 17:5-18:14.

43.     While Ms. Brown did not believe it was improper in general for candidates to seek information about the position or interview process from a member of the hiring panel, Mot. Ex. P at 88:17-89:1, she did not believe it was proper for Ms. Meirink to provide such detailed coaching to Ms. Michaels.

44.     Ms. Brown had a connection to the Colorado Supreme Court she could have asked for information, or even a reference: Ms. Moore. Mot. Ex. P at 46:1-47:13, 49:2-49:17.

45.     Ms. Brown never contacted Ms. Moore, or anyone else, to discuss the job. Mot. Ex. P at 63:13-63:19; 91:21-91:24.

46.     Had Ms. Brown contacted any member of the hiring panel, they would have provided her the same type of information they gave to other applicants. Mot. Ex. L at 63:21-64:4, 66:6-66:14; Mot. Ex. G at ¶ 17; Mot. Ex. C at ¶ 18; Mot. Ex. D at ¶ 16; Mot. Ex. F at 95:9-95:13; Mot. Ex. B at ¶ 26; Mot. Ex. R, Declaration of Hart at ¶ 21.

47.     Of the ten candidates who would receive interviews, only Ms. Brown and two others did not contact anyone at the Colorado Supreme Court to learn about the staff attorney position and/or application process. Mot. Ex. F at 123:18-129:13; Mot. Ex. C at ¶¶ 14-16; Mot. Ex. R at ¶ 20.

*Review of Applications and Pre-Interview Processes*

48.     Sixty-four candidates applied for the position. Mot. Ex. A at p. 2.

49.     Ms. Stevens did an initial cut of applicants and narrowed the pool to nineteen. Mot. Ex. R at ¶ 16; Mot. Ex B at ¶ 19; Mot. Ex. O at 130:6-132:13.

50.     In making this first cut, Ms. Stevens examined whether applicants met the minimum qualifications, had ties to the courts, and expressed interest in specifically working for the Colorado Supreme Court, among other things. Ex. O at 130:6-132:13.

51.     Some applicants did not have active bar licenses, including at least two who were interviewed, A.G. and Ms. Michaels. Mot. Ex. S, Chart of Applicants prepared by Ms. Stevens; Mot. Ex. N at 39:2-39:9.

52.     The hiring panel did not believe that the fact that a candidate's bar license was inactive at the time of application was disqualifying or relevant – a successful candidate needed only to activate their license upon being hired; however, the actual job posting required the applicant to be currently admitted to practice law in Colorado with an active license.  Mot. Ex. L at 18:13-18-22; Mot. Ex. F at 113:23-114:10.

53.     Judicial has taken this position regarding bar license with other job applicants. Mot. Ex. L at 18:13-18:22, 19:15-20:3, 22:1-22:9; Mot. Ex. O at 85:6-85:20; Mot. Ex. N at 24:17-24:22, 35:2-36:2; Mot. Ex. F at 114:1-114:6.

54.     Ms. Meirink, who is a person of color, did not have an active license at the time she applied to be a staff attorney but activated it upon accepting her job offer. Mot. Ex. F at 114:1-114:6; Mot. Ex. G at ¶ 2.

55.     Ms. Stevens sent the list of nineteen applicants to Justices Gabriel and Hart, who then together decided who to interview. Mot. Ex. O at 137:2-137:13.

56.     Ms. Stevens also sent Justices Gabriel and Hart the applications to allow them to conduct an independent review. Mot. Ex. T, Email from Stevens to Justices Gabriel and Hart, dated May 11, 2018.

57.     Justice Hart reviewed the applications and identified eight individuals she wanted to interview, including Ms. Michaels. Mot. Ex. U, Email Exchange between Justices Gabriel and Hart, Email from Justice Hart to Justice Gabriel, dated May 13, 2018, at 6:00 p.m.; Mot. Ex. N at 65:5-65:10. The list did not include Ms. Brown.

58.     Ms. Michaels had been a law librarian for the Colorado Supreme Court for seven years. Mot. Ex. Q.

59.     Ms. Michaels holds a master's degree in library science with a specialization in legal research. *Id.*

60.     Ms. Michaels' application detailed the complex legal research she regularly conducted and explained how her experience researching historical court rules would translate to the staff attorney role. I*d.*

61.     Ms. Michaels' application also described how she would excel at performing the administrative aspects of the staff attorney role. *Id.*

62.     Ms. Michaels' application expressed her dedication to serving as a long-time Judicial employee. *Id.*

63.     Ms. Stevens and Justice Gabriel were aware that Ms. Michaels wanted to work only a .8 schedule at the time she was selected for an interview. Mot. Ex. Q; Mot. Ex. L at 183:15-185:1; Mot. Ex. O at 43:13-44:14.

64.     This was not disqualifying because the Justices understood that the primary duties of the staff attorney – the rules committee work – only accounted for approximately 70% of a full-time position. Mot. Ex. L at 185:16-186:4; Mot. Ex. N at 43:5-43:15.

65.     Thus, a staff attorney working a .8 schedule would be able to accomplish the primary job duties and still be able to assist on other substantive projects. Mot. Ex. L at 186:15-186:25; Mot. Ex. N at 43:5-43:15.

66.     As noted above, Justice Hart did not identify Ms. Brown as one of her top eight choices. Mot. Ex. U, Email from Justice Hart to Justice Gabriel dated May 13, 2018, at 6:00 p.m.

67.     Justice Hart did not believe that Ms. Brown's prior work reflected the job skills that were necessary for the position; in particular, legal acumen and flexibility, Mot. Ex. N at 91:22-93:6, although in an email discussion with Justice Gabriel, Justice Hart noted that she "liked" Ms. Brown as a candidate. Mot. Ex. U at 1, Email from Justice Hart to Justice Gabriel dated May 13, 2018, at 7:51 p.m.

68.     Justice Gabriel added Ms. Brown's name to the list of candidates to be interviewed. *Id.*, Email from Justice Gabriel to Justice Hart dated May 13, 2018 at 7:06 p.m.; Mot. Ex. L at 171:15-171:19.

69.     Ms. Brown's application indicated she had been a staff attorney and senior attorney for annotations with the Office of Legislative Legal Services for twenty-three years. Mot. Ex. V (corrected), Ms. Brown's Resume; Mot. Ex. W (corrected), Ms. Brown's Cover Letter. She had three years' experience working with Colorado Supreme Court rules and

communicated multiple times with Ms. Moore.

70.     Ms. Brown tailored her application to the staff attorney position for which she was applying. Mot. Ex. P, Ms. Brown's Deposition at 68:8-68:17.

71.     In Ms. Brown's cover letter, she highlighted that for the past three years, she had reviewed and proofread the court rules, and for almost twenty-three years, had edited annotations of court decisions for "accuracy, grammar, syntax, clarity, form, and placement within the existing annotations." Mot. Ex. W (corrected).

72.     Her cover letter read, "I have been an editor throughout most of my academic and professional careers." Mot. Ex. W (corrected).

73.     Ms. Brown's resume described her job duties, as they relate to the court rules, as "review[ing], proof[ing] and index[ing] Colorado court rules." Mot. Ex. V (corrected).

74.     Ms. Brown testified that her work with the court rules includes preparing a source note and indexing and proofreading the rules. Mot. Ex. P at 45:3-45:12.

75.     Justice Gabriel added Ms. Brown's name to the list because he thought her experience as a staff attorney with the Office of Legislative Legal Services, from 1992-1995 (before she became the staff attorney for annotations), could translate to working with the rules committees. Mot. Ex. L, at 24:3-24:19; Mot. Ex. B at ¶ 21.

76.     Ms. Brown has not done this legislative committee work since 1995. Mot. Ex. P at 58:3-59:17.

77.     Justice Gabriel had hesitations about Ms. Brown's versatility because her current position seemed to involve primarily substantively editing annotations for the Colorado statutes and the court rules, which was not the function of the staff attorney position. Mot. Ex. B at ¶ 23; Mot. Ex. V at p. 1.

78.     Justice Gabriel did not know if Ms. Brown had done the complex legal research required both to serve the rules committees and to take on additional legal duties as needed. Mot. Ex. B at ¶ 23.

79.     Despite his hesitations, Justice Gabriel wanted to give Ms. Brown a chance to interview. Mot. Ex. B at ¶ 24.

80.     At the time Justice Gabriel included Ms. Brown's name, he had previously met her in person. Mot. Ex. P at 74:10-74:17 (as supplemented).

81.     Justice Gabriel agreed that Ms. Michaels should receive an interview. Mot. Ex. U, Email from Justice Gabriel to Justice Hart dated May 13, 2018, at 7:06 p.m.; Mot. Ex. L at 188:17-189:8.

82.     Prior to the interviews, Justice Gabriel and Ms. Stevens came up with a list of questions to ask each candidate during the interviews. Mot. Ex. X, Interview Questions; Mot. Ex. L at 68:20-68:25.

83.     Ms. Meirink also initially sent Ms. Stevens some suggested questions; however, those were not the questions ultimately used in the interviews. Mot. Ex. Y pp.1-2, draft questions proposed by Ms. Meirink. [Note: Ms. Brown states that internally, Mot. Ex. Y does not identify the author, but she does not dispute with any record evidence the fact allegation that is was Ms. Meirink.]

84.     Justice Gabriel and Ms. Stevens did not use the interview database that was available on the Judicial website to create the list of questions. Mot. Ex. L at 67:25-68:10, 69:21-69:24.

85.     They tailored the list of questions to elicit whether candidates possessed the requisite skills and qualifications for the job. Mot. Ex. X; Mot. Ex. L at 154:4-154:10. [Note: Although Ms. Brown denied this allegation, her record citations do not support the denial.]

86.     The panel asked questions intended to elicit information about the candidates' committee work experience. Mot. Ex. L at 75:14-75:25; Mot. Ex. X; Mot. Ex. I at 96:9-96:16.

87.     The position also required an ability to interact with many personalities with varying demands, thus the panel considered candidates' interpersonal skills as measured by the applicants' current jobs and demeanor during interviews. Mot. Ex. F at 204:4-204:14; Mot. Ex. L at 75:14-76:9; Mot. Ex. I at 93:17-94:14; Mot. Ex. N at 65:16-66:19.

88.     The panel asked about organization skills, as this was critical to the job. Mot. Ex. L at 76:1; 5-76:24; Mot. Ex. X at ¶ 4.

### *The Interviews*

89.     The interview panel consisted of Justices Gabriel (chair) and Hart, Ms. Stevens, and the three staff attorneys, Ms. Meirink, Ms. Wallace, and Mr. Beck. Mot. Ex. B at ¶ 27.

90.     All members of the hiring panel are part of the Supreme Court's Diversity, Equity, and Inclusion Group. Mot. Ex. N at 125:11-125:15.

91.     Justice Gabriel has furthered diversity in the legal community in his career, including his time on the bench. Mot. Ex. B at ¶ 3.

92.     Justice Gabriel's efforts to promote diversity extend to efforts to hire diverse candidates for attorney positions, including his law clerks and interns, and judgeships. *Id.* at ¶¶ 4, 5.

93.     Justice Hart has promoted diversity in the legal profession and extending into the workforce generally. Mot. Ex. R at ¶¶ 5, 6.

94.     Justice Hart actively recruits diverse candidates for law clerk openings. *Id.* at ¶ 9.

95.     Ms. Meirink is a minority, and throughout her legal career – both at the court and while in private practice – has engaged in efforts to recruit diverse colleagues. Mot. Ex. G at ¶¶ 2-4.

96.     The panel conducted interviews on May 22 and 23, 2018. Mot. Ex. B at ¶ 27.

97.     On the morning of the first day of interviews, the panel met and divvied up interview questions. Mot. Ex. L at 155:25-156:22, 159:19-159:23.

98.     The panel endeavored to ask each candidate the same questions, Mot. Ex. L at 132:3-132:12; Mot. Ex. F at 121:4-121:6; Mot. Ex. I at 91:6-91:13, although as they played out, it appears each candidate's session went a little differently.

99.     During the interviews, and in the context of asking candidates what they understood the job to be and why they wanted it, the panel discussed with the candidates their respective qualifications. Mot. Ex. X; Mot. Ex. L at 123:5-124:25, Mot. Ex. I at 165:12-165:20.

100.    The context of this discussion was to make clear, especially to applicants who were then employed in substantive legal positions, that the position for which they were interviewing could be in large part an administrative one, lest any of the candidates feel that they were overqualified for the position. Mot. Ex. L at 123:5-124:25; Mot. Ex. I at 164:8-165:1, 166:3-166:14, 168:2-168:5, 178:10-178:20. [Note: Ms. Brown notes that Justice Gabriel referenced the over qualification of some of the candidates; I do not view this as contradicting the fact allegations in this paragraph.]

101.    Candidates' respective qualifications came up with those both under and over age 40. Mot. Ex. I at 167:9-167:18.

102.    Justice Gabriel and other panelists believed that a candidate who had previously, for example, written substantive legal opinions for a judge and expected to do the same in the staff attorney position, might be disappointed that a large part of their staff attorney job was acting as legal and administrative support for committees and ultimately leave the position. Mot. Ex. L at 123:8-125:15; Mot. Ex. F at 197:16-200:20; Mot. Ex. I at 164:8-165:1; Mot. Ex. N at 183:15-184:11.

103.    The hiring panel did not perceive the discussion of candidates' qualifications as having anything to do with age. Mot. Ex. I at 178:3-178:20; Mot. Ex. N at 182:12-183:14; Mot. Ex. O at 107:25-108:20, 109:7-109:16.

104.    Ms. Michaels was the first interview on the first day. Mot. Ex. B at ¶ 28.

105.    Following Ms. Michaels' interview, Justice Gabriel commented that she set the bar extremely high because the panel was very impressed with her. Mot. Ex. B at ¶ 28; Mot. Ex. O at 199:2-199:3.

106.    Ms. Brown interviewed on the second day. Mot. Ex. B at ¶ 29.

107.    At no time during her interview process did Ms. Brown believe she was subject to race or age discrimination, Mot. Ex. P at 87:16-87:19, although she had concerns that the process itself did not conform to best practice standards and could lead to implicit bias.

108.    On the second day of interviews, May 23, 2018, Ms. Moore sent an email to Justices Gabriel and Hart, stating:

> I'm writing to show my support for Kathryn Michaels as she proceeds in the process for the Supreme Court Staff Attorney position. Kathryn has the experience and skills necessary to do the position now, primarily working the rules committees, but if the position were to expand in the future, she could grow with it. In addition to her law degree, she has a Masters Degree in Library Science, and she writes well. Kathryn has stellar legal research skills, specifically, with working with historic Colorado materials, something that comes up often

> working with the court rules. Personality-wise, I think Kathryn would be a good addition to the staff attorney group, and she has a workstyle that is in-line with working for the supreme court.
>
> I spoke with many people interested in the position, but Kathryn was the only person that I thought had the experience, skills, and demeanor necessary to be successful….

Mot. Ex. Z, Email from Ms. Moore to Justices Gabriel and Hart, dated May 23, 2018; Mot. Ex. E at ¶ 13.

109.    No one asked Ms. Moore to send this email. Mot. Ex. E at ¶ 13.

110.    Ms. Moore recommended Ms. Michaels because she believed her skillset made her extremely qualified. *Id*. at ¶ 14.

111.    Ms. Moore also recommended Ms. Michaels because she believed Ms. Michaels understood the staff attorney position did not involve substantive legal work, and Ms. Michaels was excited about, and would remain satisfied in, the position nonetheless. *Id*. at ¶ 15.

112.    Ms. Moore was aware Ms. Brown had applied for the position at the time she sent her email recommending Ms. Michaels. Mot. Ex. P at 64:13-65:11.

113.    Ms. Moore did not mention or recommend Ms. Brown to the hiring panel. Mot. Ex. Z; Mot. Ex. N at 208:16-208:25.

114.    Ms. Brown never experienced any racial or age bias from Ms. Moore during their professional interactions. Mot. Ex. P at 67:24-68:2.

***Hiring Panel Deliberations***

115.    Following completion of the interviews on May 23, 2018, the hiring panel discussed the position and the candidates. Mot. Ex. L at 211:15-212:20.

116.    The panel identified two front-runners: Ms. Michaels and K.M., though the panel also spent some time discussing M.B. (M.B. not being Ms. Brown) and S.D. Mot. Ex. L at 161:4-

161:22, 211:15-212:20; Mot. Ex. O at 215:16-215:21; Mot. Ex. F at 156:22-157:3; Mot. Ex. I at 160:22-160:25; Mot. Ex. N at 133:7-133:20, 188:3-188:15.

117.    The panel discussed candidates' qualifications, including flexibility and resilience and ability to work with different personalities. Mot. Ex. L at 128:8-129:4, 132:23-133:14.

118.    Many on the panel believed that K.M., who was over the age of 40, gave a strong interview. Mot. Ex. L at 133:22-134:12, 200:16-201:1.

119.    The panel also discussed references for Ms. Michaels and K.M. Mot. Ex. B at ¶ 31.

120.    The panel considered that Ms. Moore recommended Ms. Michaels and that the two shared similar prior work experience. Mot. Ex. F at 70:10-70:12, 159:10-159:25; Mot. Ex. B at ¶ 31.

121.    Ms. Moore's recommendation carried significant weight as the Supreme Court, and the rule committee chairs highly respected Ms. Moore. Mot. Ex. AA, Email from Court of Appeals Judge to Justice Gabriel, dated May 16, 2018 at 10:56 am; Mot. Ex. L at 100:21-100:23, 211:15-212:20, 214:12-214:17; Mot. Ex. F at 106:6-107:17, Mot. Ex. N at 131:4-131:8, 221:14-222:3.

### *Selection of Ms. Michaels*

122.    Either the afternoon of May 23 or the morning of May 24, 2018, the panel met to make a final decision. Mot. Ex. L at 211:15-212:20.

123.    The panel unanimously identified Ms. Michaels as the best candidate for the position. Mot. Ex. L at 137:10-137:13, 213:18-214:1; Mot. Ex. F at 161:5-161:14.

124.    In selecting Ms. Michaels as his top choice, Justice Gabriel relied upon the following perceptions:

a.  Ms. Michaels gave the best interview. Mot. Ex. B at ¶ 32a.

b.  She was exceptionally calm, poised, confident and professional, which was important for working for the rules committees. *Id*.; Mot. Ex. L at 133:22-135:1, 137:16-138:2.

c.  She displayed strong interpersonal skills which led him to believe that she would excel at managing the wide array of personalities on the various committees. Mot. Ex. B at ¶ 32a.

d.  Ms. Michaels' prior experience working with judges, which she relayed to the panel, demonstrated that she would be comfortable working with the rules committees' chairs, most of whom are judicial officers. Mot. Ex. L at 134:21-134:25; Mot. Ex. B at ¶ 32d.

e.  Ms. Michaels' experience as a law librarian rendered her particularly well-qualified to perform the kinds of unique legal research that she might be called on to undertake in the staff attorney position. Mot. Ex. B at ¶ 32c.; Mot. Ex. L at 193:21-194:2.

f.  Ms. Michaels' description of her organization skills gave Justice Gabriel confidence that she could multi-task and juggle several committees simultaneously. Mot. Ex. B at ¶ 32d.

g.  Ms. Michaels understood precisely what the job entailed and was excited about the opportunity. Mot. Ex. L at 135:1-135:4, 137:16-138:2; E. B, Declaration of Gabriel at ¶ 32b.

h.  Ms. Michaels expressed a willingness to undertake, and was enthusiastic about the possibility of undertaking, other staff attorney duties beyond rules committee

work, and she inspired great confidence that she would be able to successfully perform such duties. Mot. Ex. B at ¶ 32e.

125.   Justice Hart selected Ms. Michaels as her top choice, based on the following:

a.     Justice Hart wanted an individual whose prior job involved varying tasks that invoked different skills and intellect, and Ms. Michaels' position in the library demonstrated this versatility. Mot. Ex. N at 67:14-68:1, 75:20-76:2, 77:19-78:2, 130:12-130:23; Mot. Ex. R at ¶ 25a.

b.     Justice Hart believed that Ms. Michaels had great ability to provide quick and skilled legal research, including historical research, which was important to the position. Mot. Ex. N at 76:3-76:16, 130:10-131:3; Mot. Ex. R at ¶ 25b.

c.     Justice Hart knew that Ms. Michaels had worked with several judges in the past and was adept at working with lots of different people, also critical for the staff attorney role. Mot. Ex. N at 65:18-65:20, 75:22-76:5; 184:25-186:23; Mot. Ex. R at ¶ 25c.

d.     Justice Hart believed Ms. Michaels was highly organized. Mot. Ex. R at ¶ 25d.

126.   Ms. Meirink identified Ms. Michaels as the top candidate following the interviews because:

a.     Ms. Michaels' experience as a law librarian directly translated to her ability to perform legal research for rules committees, for example, historical research as to past versions of rules. Mot. Ex. F at 69:13-69:25.

b.     The staff attorney position originated in the library and Ms. Michaels had worked with and in the same job as the incumbent, Ms. Moore; therefore, Ms. Michaels would be able to easily fill Ms. Moore's shoes. *Id*. at 70:10-70:12.

c.      Ms. Michaels' prior experience as a law librarian was relevant. *Id*. at 70:1-70:9.

d.      Ms. Meirink believed, through her experience with Ms. Michaels as a law librarian, that Ms. Michaels' produced work product that was succinct, thoughtful, and exceeded expectations. *Id*. at 71:10-72:1.

e.      Ms. Michaels' poise and professionalism equipped her to deal with rules committees members. *Id*. at 72:6-73:14.

127.    Ms. Wallace identified Ms. Michaels as her top choice because:

a.      Ms. Michaels' library background made her uniquely qualified to step into Ms. Moore's vacancy. Mot. Ex. C at ¶ 21a.

b.      Ms. Michaels' prior job included performing specialized legal research, most often at the request of judges, which would translate to the duties of staff attorney in providing legal support to the rules committees. *Id.* at ¶ 21b.

c.      Ms. Michaels served on the Judicial Learning Center Committee, and in that role was familiar with committee work and working with various members of a committee. *Id*. at ¶ 21c.

d.      Ms. Michaels had the requisite organization skills and ability to multi-task. *Id*. at ¶ 21d.

e.      Ms. Michaels presented as poised, prepared, and enthusiastic about the position. *Id.* at ¶¶ 21e, 21f.

f.      Ms. Michaels was already a judicial employee. *Id.* at ¶ 21g.

g.      Ms. Michaels was an internal candidate, and there are business reasons to promote someone from within, including employee morale and retention. *Id.* at ¶¶ 4, 21g.

128.    Jeremy Beck was generally impressed with Ms. Michaels' combination of intelligence, legal research capability, library experience, and interview performance, Mot. Ex. I at 170:5-170:18, and specifically, based his decision to select her on the following:

a.    Ms. Michaels' law library experience demonstrated that she would have "general research acumen" and an "instinctive hand" to locate legal information. Mot. Ex. I at 147:8-147:14.

b.    Ms. Michaels had conducted tours for the Judicial Learning Center and in that role she was able to adjust her presentation to a wide range of people – from school-aged children to retired judges – which was also a skill that was necessary for dealing with rules committees members. Id. at 147:15-148:6, 170:15-170:18.

c.    Ms. Michaels had a "deeply impressive interview." Mot. Ex. I at 163:2-163:5.

129.    Ms. Stevens evaluated the candidates during the application and interview process and believed Ms. Michaels was the best choice. Mot. Ex. O at 124:25-125:11.

130.    Ms. Brown does not have a factual basis to dispute Ms. Michaels' interview performance but argues Ms. Michaels was "coached prior to her interview." Mot. Ex. BB, Ms. Brown's Supplemental Reply to EEOC Charge at p. 1-2.

131.    While does not believe it was discriminatory for Ms. Meirink to provide Ms. Michaels with interview advice, Mot. Ex. P at 91:14-91:17, she does believe the information provided to Ms. Michaels went beyond advice and was not appropriate.

132.    Despite the posting's language, none of the hiring panel members considered whether candidates' bar licenses were active at the time of the selection deliberations, as activation of an inactive license is easy and could be completed by a successful candidate before beginning in the position. Mot. Ex. F at 113:22-114:5; Mot. Ex. N at 31:20-32:5, 35:21-36:2.

133.   At the time of the selection, the hiring panel members had Ms. Michaels' application, which stated that she only wanted to work .8 FTE so that she would have an extra day with her children. Mot. Ex. Q.

134.   Ms. Michaels accepted the position on or about May 24, 2018. Mot. Ex. L at 43:4-43:7, 212:24-213:1.

***Ms. Brown's Candidacy and Nonselection***

135.   Following the interviews, the hiring panel did not discuss Ms. Brown. Mot. Ex. L at 161:4-161:22, 211:15-212:20; Mot. Ex. O at 215:16-215:21; Mot. Ex. F at 156:22-157:3; Mot. Ex. I at 160:22-160:25; Mot. Ex. N at 133:7-133:20, 188:3-188:15.

136.   The panel did not perceive Ms. Brown's recent work experience, which primarily included drafting and editing annotations and indexing and proofreading the court rules, as sufficiently qualifying for the staff attorney position. Mot. Ex. N at 209:7-210:8; Mot. Ex. B at ¶¶ 22, 23; Mot. Ex. V; Mot. Ex. P at 33:6-34:25, 35:15-36:24, 39:20-40:11, 45:3-45:25, 52:15-53:24.

137.   Justice Gabriel had the following impressions of Ms. Brown based on her application and interview:

a.   Ms. Brown did not understand the job, and even after he explained it, she focused on her experience drafting and editing annotations. Mot. Ex. B, Declaration of Gabriel at ¶¶ 33a, 33b.

b.   After learning of the administrative nature of the position, Ms. Brown did not display any enthusiasm for that type of work, nor did she share with the panel why she was qualified to perform the administrative aspect of the position as

advertised. *Id.* Ms. Brown avers that she was excited about the job and expressed the same.

c.      Ms. Brown did not demonstrate that she could perform the complex legal research that would be required by the rules committees' members. *Id.* at ¶ 33b.

d.      When asked about her comfort in performing additional job duties that would arise, Ms. Brown displayed surprising hesitancy and insecurity. *Id*. at ¶ 33c.

138.    Justice Hart did not view Ms. Brown as a viable candidate after the interviews because:

a.      Justice Hart wanted to hire an individual who was skilled at doing complex legal research, and Justice Hart did not perceive that Ms. Brown's current position editing annotations demonstrated such an ability. Mot. Ex. R at ¶ 26b.

b.      Ms. Brown's current role was very narrow, and she did not explain in her interview how this experience would translate to the versatile staff attorney position, including duties outside of the rules committees' work. *Id.* at ¶¶ 26b, 26c.

c.      Ms. Brown did not understand that the nature of the job was working for rules committees; her answers during her interview gave the perception that she believed she would be doing the substantive editing. *Id.* at ¶ 26a.

d.      Ms. Brown did not demonstrate enthusiasm about the position. *Id.* at ¶ 26c.

139.    Ms. Meirink had the following impressions of Ms. Brown:

a.      Ms. Brown did not explain or demonstrate an ability to facilitate and manage varying personalities on the rules committees. Mot. Ex. F at 190:6-190:11.

24

b.   Ms. Brown did not understand that the staff attorney position did not involve substantive editing, but instead primarily involved providing legal research and administrative support to rules committees. *Id.* at 149:15-149:21, 151:2-151:15.

c.   When Ms. Brown learned that the rules committee portion of the staff attorney job duties was providing support to the rules committees, her answers to the panel suggested that she did not want the job as it existed. *Id.* at 131:15-131:25, 152:9-152:20.

140.   Mr. Beck had the following impressions of Ms. Brown:

a.   Mr. Beck thought that Ms. Brown's experience working with the legislature could be useful. Mot. Ex. I at 107:23-108:2, 109:7-109:14.

b.   However, Mr. Beck observed that Ms. Brown "didn't have as firm a grasp on the position as some of the other candidates." Mot. Ex. I at 108:18-108:24.

c.   More importantly, from Mr. Beck's perspective, Ms. Brown did not express any confidence in her ability to take on more substantive legal duties that would arise beyond simply working with the rules. Mot. Ex. I at 108:6-109:6, 112:8-113:11, 140:11-140:17, 172:14-172:19.

141.   In September of 2018, Ms. Brown filed a charge of discrimination with the EEOC. Mot. Ex. CC, EEOC Charge.

142.   In her Supplemental Reply to that charge, she wrote that the "primary responsibility of the Rules Attorney position . . . is to review, analyze, and correct errors in the Supreme Court rules." Mot. Ex. BB at p. 4.

143.   In her charge she also wrote that she "brought to her interview Book 1 of the Colorado Court Rules flagged with all of the rules issues and errors" she had identified. *Id.*

144.    Ms. Brown has emphasized, throughout the EEOC investigation and this litigation, that Ms. Michaels never edited or drafted a court rule. Mot. Ex. DD, Ms. Brown's Responses to Defendants' Written Discovery Requests at p. 2, Interrogatory No. 1; Mot. Ex. M, p. 36, Interrogatory No. 10.

145.    The staff attorney does not substantively index, edit, or draft rules or annotations. Mot. Ex. L at 189:9-192:1; Mot. Ex. F at 130:22-131:8; Mot. Ex. N at 209:21-210:8.

146.    The staff attorney, now Ms. Michaels, does provide administrative and legal support to the rules committees. Mot. Ex. J, at 30:16-31:4, 32:25-34:11.

147.    The staff attorney, now Ms. Michaels, does perform some legal research and substantive work outside of the rules committees context. Mot. Ex. N at 109:22-111:5; Mot. Ex. J at 30:22-31:25, 41:4-41:25, 44:2-45:6.

*Aftermath and Investigation*

148.    There is no direct evidence that race or age played a role in the hiring decision. Mot. Ex. N at 237:11-237:13; Mot. Ex. R at ¶¶ 27, 28; Mot. Ex. B at ¶¶ 36, 37.

149.    The record contains unrebutted fact evidence that the panel selected Ms. Michaels because they believed her to be the most qualified for the staff attorney position. Mot. Ex. B at ¶ 38.

150.    Ms. Brown believes she is more qualified than Ms. Michaels, who is Caucasian. Mot. Ex. P at 122:6-123:19; Mot. Ex. DD at p. 2, Interrogatory No. 1. Ms. Brown also asserts Ms. Michaels' lack of a current active law license rendered her not qualified under the job posting.

151.    Ms. Brown's evidence of age discrimination is her belief that she is more qualified than Ms. Michaels, who is under age forty. Mot. Ex. P at 123:20-134:9; Mot. Ex. DD at pp. 2-3, Interrogatory No. 2.

***Additional Factual Allegations by Ms. Brown***

Ms. Brown submitted some 466 additional "undisputed facts." Where they are relevant to the facts noted above, I have included them. I will also address, mostly in broad categories and in narrative, summarized form, other facts alleged by Ms. Brown. Some of these may duplicate in part those facts stated above.

Ms. Brown applied for the staff attorney position on May 2, 2018. Then, and now, she was employed by the Colorado General Assembly as a legislative legal services officer. In the position she had three years of direct experience working with Colorado Supreme Court rules. This includes many interactions with Colorado Supreme Court Rules Attorney Jenny Moore. Ms. Moore resigned from this position, and that vacancy is what is at issue in this case.

Judicial has a set of Personnel Rules. Under the Colorado Supreme Court's Equal Employment Opportunity & Diversity Plan (EEO Plan), supervisors and judges are required to follow the Personnel Rules. Members of the hiring panel, including Ms. Stevens and Justice Hart, did not know whether, during this hiring process, they were required to follow the Personnel Rules, and they had never read the EEO Plan.

Ms. Stevens sent an email to Ms. Michaels asking to see her about applying for the vacant position. They did meet and discuss the position. During this meeting Ms. Michaels disclosed she only wanted to work .8 of the time. Ms. Stevens conferred with Justice Gabriel, and he confirmed Ms. Michaels could apply even though she wanted to work less than full time.

Ultimately it was Justice Gabriel, in conferral with others on the panel, who made the decision to permit the position to be .8 full time.

Ms. Michaels knew Ms. Moore, and they were social friends. At Ms. Moore's recommendation, Ms. Michaels contacted Ms. Meirink about the vacant position. Ms. Meirink encouraged Ms. Michaels to apply for the position. Ms. Michaels stated she wanted to work less than full time, and Ms. Meirink continued to support and encourage her to apply, stating that it could be a part-time position. Ultimately Ms. Meirink gave Ms. Michaels advice on what to wear to an interview and what to talk about during the interview. Various other panel members had contacts with certain applicants prior to the interviews.

As noted elsewhere herein, the job posting required an active bar license. The parties differ as to their interpretation of that requirement. In any event, there is a Colorado Judicial Personnel Rule requiring that if a substantial change is made in a job announcement, current applicants must be notified of the change. The posting in this case was never changed.

Applicants listed the date of their law school graduation. Ms. Brown avers, and I generally agree, that candidates who graduated in 2003 or earlier (fifteen years before this selection process) were likely to be at or over the age of forty. Twenty-nine of the sixty-three applicants with a law degree graduated in 2003 or earlier, and four of those were selected among the final nineteen for a closer look. Thirty-four applicants graduated after 2003, and fifteen of those were among the final nineteen. Justice Hart chose eight of the nineteen for interviews, and all eight graduated from law school after 2003. Justice Gabriel added two names, including Ms. Brown. Justice Hart emailed Justice Gabriel stating that she liked the additional two candidates, but in her deposition, Justice Hart acknowledged she did not mean it. In fact, she did not think Ms. Brown was a good candidate at all.

During the interviews, the hiring panel emphasized the temperament and demeanor of the candidates as it related to their ability to do the job. Ms. Stevens developed questions for the interviews, and Justice Gabriel participated in creating the final set of questions. The panel ultimately selected eight questions to ask the candidates. The panel's memory differed as to whether each of the ten interviewees was asked the identical eight questions. When compared with Ms. Brown's memory of the interview, anywhere from four to eight questions were asked of the interviewees. Various of the panel gave good marks to Ms. Brown for her interview.

Ms. Brown includes numerous facts about the post-selection process, including the involvement of her spouse, Mr. Maikovich, who was a former Plaintiff in this case. There is no claim pending in this lawsuit other than for the nonselection. I find that none of this discussion is relevant to the issue of whether the hiring panel engaged in race or age discrimination when the selection was made. This includes the facts surrounding an independent investigation of process used in this selection, conducted by Paul Buckley, an HR professional who was brought in by the Supreme Court Administrative Office. This lawsuit under Title VII and the Age Discrimination in Employment Act is reviewed *de novo*, and nothing Mr. Buckley concluded is relevant.

Judicial Personnel Rule 16.C requires that a very particularized list of documents generated during testing and/or interviews be maintained for three years: "[R]ecords of any testing and/or interviews that may be given, including test results, applications and test papers for each applicant, names of interviewers, summary data on number of applicants and test results, and such other information as the State Court Administrator . . . may deem pertinent."  "Notes" is not on the list. The hiring panel did not keep their handwritten notes of the interviews, in order to protect the confidentiality of the applicants.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v.*

*Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002).  These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'"  *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting C*elotex*, 477 U.S. at 324).  "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge."  *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005).  "The court views the record and draws all inferences in the light most favorable to the non-moving party."  *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

Under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), Ms. Brown has the burden to establish a *prima facie* case of failure to hire based on her age and/or race. She "'must show that (1) [s]he applied for an available position; (2) [s]he was qualified for the position; and (3) [s]he was rejected under circumstances which give rise to an inference of unlawful discrimination.'" *Laul*, 765 F. App'x at 440 (quoting *Anaeme v. Diagnostek, Inc*., 164 F.3d 1275, 1278 (10th Cir. 1999)). Alternately, the Tenth Circuit has used the traditional four-part test in nonselection cases: "To establish a prima facie failure-to-hire claim, '[t]he plaintiff must show: (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *Brown v. Keystone Learning Servs*., 804 F. App'x 873, 879 n.13 (10th Cir. 2020).  For the fourth element, it appears sufficient for the

plaintiff to show that the position for which she was not hired was filled. *Amro v. Boeing Co.*, 232 F.3d 790, 796 (10th Cir. 2000). I will address both iterations of the prima facie case herein.

For purposes of my analysis, I accept that Plaintiff has established a *prima facie* case under the four-part test. "If the defendant articulates a nondiscriminatory reason, the burden shifts back to plaintiff to show a genuine issue of material fact as to whether the defendant's reason . . . is pretextual." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1308 (10th Cir. 2017) (quotations omitted). The three-part *Laul* test essentially incorporates the concept of pretext in the third element. I will discuss Ms. Brown's allegations of pretext in the order she presents them.

## A.      Procedural Irregularities

Ms. Brown first argues that procedural irregularities in the hiring process are relevant to the issue of pretext. I agree. *E.g.*, *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 889 (10th Cir. 2018). However, procedural irregularities alone, even disturbing ones, are "not enough to show pretext and thereby satisfy *McDonnell Douglas* without 'something more' to show that [an employer's] decision results from" prohibited bias. *Doe v. Univ. of Denver*, 1 F.4th 822, 832 n.8 (10th Cir. 2021). On the other hand, such irregularities do "lower the threshold for how much additional evidence of" bias is needed. *Id.* Defendant cites to Tenth Circuit authority for the propositions that (1) employers often depart from employment policies for benign (even sound business) reasons, and the Court's job is not to enforce such policies but to protect against unlawful discrimination; and (2) to be considered pretextual, a procedural irregularity must "directly and uniquely disadvantage a minority employee." *Hamilton v. Oklahoma City Univ.*, 563 F. App'x 597, 605 (10th Cir. 2014) (citation omitted).

The first irregularity Ms. Brown proffers is the fact that at the time she applied and was selected, Ms. Michaels did not have an active bar license. Only after she was selected did she activate her license. Therefore, Ms. Brown argues, Ms. Michaels did not meet the minimum qualifications for the posted position. Ms. Brown cites to testimony of the former HR director for Judicial stating that in his fifteen years in that position, he could not recall any other employee who was hired who did not meet the minimum qualifications for a posted position.

I note the following discussion from a recent Tenth Circuit case that is apropos to this analysis:

> True, the Position's "minimum qualifications" include some level of PGA experience. Appellant's App. vol. 3 at 607. But a closer examination of the applicant pool and the panelists' top-ten lists reveals that the panelists didn't place a premium on that requirement—for any applicant. And, while it may have been imprudent for the panelists to discount the requirement, that doesn't necessarily create a Title VII issue. *Cf. Hamilton v. Okla. City Univ.*, 563 F. App'x 597, 606 (10th Cir. 2014) (rejecting the argument that "an employer's departure from the stated criteria in a job announcement should invariably create an inference of pretext").

*Sasser v. Salt Lake City Corp.*, 772 F. App'x 651, 669 n.28 (10th Cir. 2019). The evidentiary record demonstrates that despite its inclusion in the posting, the selection panel did not consider it in their decision. Furthermore, several of the panel members stated that their understanding of this qualification was that the successful applicant needed to *ultimately* have an active license to hold the position. Besides Ms. Michaels, another interviewee (a person of color) did not hold an active license. Furthermore, Judicial has not regarded this "requirement" as necessary in other selections. Finally, the failure to mandate preselection active bar admission did not, on this record, create any disadvantage for minority or older employees. As a result, if this "irregularity" (to the extent it even is one) moves the needle, it does so only in the slightest, because it is benign under these circumstances.

The next alleged irregularity is that although the position was posted as full time, Ms. Michaels was hired as a .8 FTE at her request.  In her brief, Ms. Brown admits that there was no discussion whatsoever of Ms. Michaels' request to be less than full time, and that this only happened after the selection. This cannot possibly serve as a basis for finding pretext.

Ms. Brown also cites the allegedly misleading job posting. Resp. at 92 ("Defendant intentionally posted a 'General Statement of Duties' that had no relationship to the duties of the position."). But Ms. Brown does not explain how this is evidence of pretext other than the bare assertion that it another example of a procedural irregularity. I am not persuaded.

Ms. Brown states that "[m]embers of the hiring panel failed to follow [Judicial] Personnel Rules during the hiring process, did not know the content of the rules, and did not even know whether they are supposed to follow the rules." *Id.* However, by her own admission, the selection panel could not have engaged in intentional discrimination by these actions, because if Ms. Brown is correct, they did not even know the rules they were supposedly violating. Moreover, as noted above, the courts do not endeavor to enforce HR policies but enforce antidiscrimination laws, and this allegation creates no inference of pretext.

The same is true for the allegation that some of the panel members destroyed their notes from the interviews, allegedly a violation of a Judicial personnel rule. Under a plain reading of Judicial Personnel Rule 16.C (and, by the way, Ms. Brown advocates for a plain reading of the "active bar license" requirement), it requires that a very particularized list of documents generated during testing and/or interviews be maintained for three years, and "notes" is not on the list. Nor does Ms. Brown point to any inference of discrimination based on the panelist's destruction of handwritten notes (which, they testified, was done so for privacy reasons).

In sum, I cannot find that the allegations of procedural irregularities, even taken as a whole, meet Ms. Brown's burden of establishing pretext. It is not a close question. For each supposed irregularity, Judicial offers a logical and understandable explanation that has nothing to do with intentional discrimination.

**B.     Differential Treatment**

Ms. Brown argues she was treated differently than Ms. Michaels, because Ms. Michaels received significant attention from the hiring panel prior to the interviews, more than any other candidate and certainly more than Ms. Brown. It is true that unexplained differences in treatment may be evidence of pretext, *Herrera v. United Airlines, Inc.*, 754 F. App'x 684, 691-92 (10th Cir. 2018), but such differences must be based on an employee's protected class characteristics. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000). "Differences in treatment that are trivial or accidental or explained by a nondiscriminatory motive will not sustain a claim of pretext." *Id.* Most "differential treatment" cases involve dissimilar adverse consequences for two comparator employees who violated an employer's rules or engaged in misconduct. *E.g.*, *Herrera*, 754 F. App'x at 693 (setting forth a three-part test for differential treatment based on violation of employer rules). In almost all reported cases, the test for establishing differential treatment requires that the comparators be *employees.* In *Sasser*, however, the Tenth Circuit addressed this argument in the context of a failure to promote. "Aside from evidence of disparate treatment from coworkers, a discriminatory purpose also may be inferred from evidence of 'differential treatment at the interview stage.'" *Sasser*, 772 F. App'x at 665 (quoting *Danville v. Regional Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002)).

The *Sasser* court addressed a hiring panel's preferences among candidates for a certain type of background or experience, stating that as long as any such preferences are race (or age)

neutral, they are not evidence of pretext. *Id.* The court did find that one panelist exhibited three examples of potential preference toward a white candidate *and against* the unsuccessful minority candidate, stating that this evidence "tends to support an inference of pretext" as to that panelist's motive. Here, there is no such series of disparate treatments of Ms. Michaels by a particular panelist as compared with a minority candidate, Ms. Brown.

Ms. Meirink appears to have encouraged Ms. Michaels to apply (but not knowing, of course, who else would apply); provided her advice on what to wear to an interview; gave her a copy of the Colorado Judicial Department Interviewing Questions Database; and provided information about potential questions and answers. But the record fails to establish that, in so doing she specifically *excluded* other candidates from similar assistance, or in fact, refused any request by Ms. Brown or anyone else for advice. The record shows *no* instance of any panel member rejecting any candidate's request for advice. The fact that Ms. Michaels was a very eager candidate who proactively contacted one or more hiring panelists about the position raises no inference of discrimination against Ms. Brown. Unlike the list of suspicious actions by the hiring panelist in *Sasser*, Ms. Meirink merely appears to have been enthusiastic about Ms. Michaels' candidacy, but there is no circumstantial evidence whatsoever that these actions involved a motive to exclude Ms. Brown. In part or in sum, I do not believe they are evidence of pretext.

Although she does not make this specific argument, Ms. Brown's factual allegations raise the prospect of preselection. Preselection can be evidence of discrimination, but it does not alone support that inference, especially without any evidence that Ms. Brown suffered uniquely among the other unsuccessful candidates. *Id.* at 673 ("Absent evidence that [plaintiff] suffered uniquely as a minority applicant, we see no reason to question [the hiring panelist's] legitimate,

nondiscriminatory rationale for contacting only [two preferred candidates].").  I do not see an inference of discriminatory motive here.

## C.     Excessively Subjective Decisionmaking

Ms. Brown contends that the interview process was so subjective that it should be viewed as a pretext for discrimination. She points to the language used in the interview questions (the same questions being given to all candidates), such as: "What do you think is the most important skill required for this job?"; and "In terms of your skill set, what makes you most nervous about the job?" Ms. Brown focuses exclusively on the interview questions and not the pre-interview process. Finally, Ms. Brown argues that questions concerning the candidates' disposition or temperament are evidence of implicit bias based on cultural differences.

Subjectivity in hiring has long been one aspect of potential discrimination to which the courts have looked as part of their analysis of intentional discrimination. *E.g.*, *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218 (10th Cir. 2002). In an effort to avoid becoming a "super personnel department," the Tenth Circuit has stated:

> Indeed, some subjectivity is to be expected in every hiring decision. "Title VII does not do away with traditional management rights. An employer has discretion to choose among equally qualified candidates, provided that the decision is not based upon unlawful criteria." . . . . Thus, we "typically" will infer pretext from the employers' use of subjective evaluation criteria in the hiring process "only when the criteria on which the employers ultimately rely are entirely subjective in nature." . . .  And, in determining if this is so, we will carefully evaluate whether "the opaqueness" of the employers' hiring system makes it "susceptible to unspoken discriminatory input[.]"

*Conroy v. Vilsack*, 707 F.3d 1163, 1177–78 (10th Cir. 2013) (citations omitted). The *Conroy* court appeared to require that in order for a plaintiff to persuade the court that the subjectivity rose to the level of pretext, the hiring process as a whole had to be "opaque" and "wholly subjective." *Id.* at 1177. Here, as in *Conroy*, the selection process appears to have been

transparent and reflected that all employees were evaluated according to the same criteria, having been assessed in nondiscriminatory terms. *Id.* at 1178.   Furthermore, any interview-based selection process inherently involves some subjectivity.  *Turner v. Pub. Serv. Co. of Colorado*, 563 F.3d 1136, 1145 (10th Cir. 2009). Again, it is only when the entire process is excessively subjective that the courts infer pretext. *Id.*

Regarding any questions the panel asked about temperament or disposition, these questions were asked of all candidates. In most cases in which these sorts of considerations arise during a hiring process and an allegation of pretext is made, it is because the hiring authority did not view the unsuccessful minority candidate as having the appropriate temperament. Understandably, rejecting a candidate because of temperament can lead to implicit or explicit bias based on culture or ethnicity, but merely asking questions of all candidates about temperament, or making it a general consideration during the hiring process, does not raise the same concerns from a pretext analysis viewpoint.  Moreover, nothing in the undisputed facts demonstrates that Ms. Brown's candidacy was unsuccessful because of considerations of temperament or disposition. There was no "excessive subjectivity" in this selection when viewed as a whole.

**D.    Statistical Evidence Showing Age and Race Disparities in Hiring**

Ms. Brown contends that, in connection with her age claim, the winnowing process from application to interview demonstrates, statistically, an anti-age bias. Specifically, she contends that twenty-nine of the sixty-three applicants had a law school graduation date of 2003 or prior (thus, in 2018, at the time of the interviews, this pool would have been out of law school fifteen years and were likely to be at least forty years old); Ms. Stevens selected nineteen of the sixty-three applicants for interviews; and Justice Hart approved eight of the nineteen for interviews,

eliminating all four of the pre-2004 law graduates (Justice Gabriel later adding two applicants to the interviews, including Ms. Brown).

First, a law school graduation date does not directly correlate with age, and Ms. Brown offers no evidence of the actual age of the applicants. Indeed, one candidate selected by Justice Hart was over forty years of age despite a more recent graduation date. Second, the requirements for the job included six years' post-law school experience, so the law school graduation date was a necessary, legitimate, nondiscriminatory qualification. Finally, "in order for statistical evidence to create an inference of discrimination, the statistics must show a significant disparity and eliminate nondiscriminatory explanations for the disparity." *Fallis v. Kerr–McGee Corp.*, 944 F.2d 743, 746 (10th Cir.1991). Ms. Brown makes no effort to eliminate nondiscriminatory explanations for the statistical evidence she presents. These statistics fail to account for any number of other variables and, thus, do not constitute evidence of pretext. *Sanders v. Sw. Bell Tel., LP*, 544 F.3d 1101, 1110 (10th Cir.2008).

Ms. Brown also addresses the racial composition of a five-year sampling of law clerks selected by Colorado Supreme Court justices. How an individual judge chooses a law clerk has no similarity whatsoever with Judicial's application process and hiring of the staff attorney under these facts and, thus, is an invalid comparison. Ms. Brown also addresses the racial composition of staff attorneys during this time, but the total number of staff attorneys was only three, and they apparently were there the entire five-year period. In no case law I could find was such a small sample considered any evidence whatsoever of discrimination.

**E.**   **Judicial's Allegedly Materially False Position Statement to the EEOC**

With regard to Judicial's EEOC Position Statement, Ms. Brown states that it told the EEOC there was a prepared list of questions for all applicants, and all applicants were asked the

same questions. I agree with Ms. Brown that the subsequent testimony and statements from individual panel members given during discovery in this case suggests that was not the way it happened. Some interviewers recalled asking up to twelve questions, others eight questions, and Ms. Brown states she was asked four questions. I will also assume for purposes of this Motion that no matter how many questions were asked, all candidates were not asked the same questions. I do not find a *material* misrepresentation on these facts by Judicial, and certainly not one that creates an inference of discrimination. Several of the interview panelists' testimony was consistent with the Position Statement, others not. Ms. Brown's argument would put the burden on an employer, at the very earliest stage of an EEOC claim, to engage in massive internal discovery so that nothing it says to the EEOC is inaccurate in any way. That is an impossible standard, and one that no case I could find imposed. Furthermore, to the extent Ms. Brown implies that the law requires each candidate to be asked the exact same questions, I disagree. "There is no legal requirement that an interviewer ask all job applicants the exact same questions. Applicants for a job typically come to the process with diverse professional backgrounds. Exploring these backgrounds may require an interviewer to ask different questions of different applicants. Job interviews are often a give-and-take process." *Blise v. Antaramian*, 409 F.3d 861, 868 (7th Cir. 2005).

The next alleged misrepresentation in the Position Statement proffered by Ms. Brown is that, during her interview, she stated she "was uncomfortable with the research duties and other duties that had been added to the role" since the prior attorney's departure. Resp. at 107. Ms. Brown denies this. The language of the Position Statement is consistent with the undisputed facts noted above when viewed from the interviewers' statements concerning Ms. Brown's body language and voice hesitancy while answering questions concerning the nature of the research

and other duties, but I agree that none of the panelists testified that Ms. Brown *verbatim* made such a statement.  If, in this circumstance, I could find "defendant's proffered non-discriminatory explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief," *Johnson v Weld Cty.,* 594 F.3d 1202, 1211 (10th Cir. 2010), then Ms. Brown could establish sufficient evidence of pretext to create a jury question. I simply cannot make such a finding. The inconsistencies argued by Ms. Brown have a logical, nondiscriminatory explanation (including imperfect human memories), which prohibits me from finding pretext.

## F.    Explanation for Ms. Michaels's Selection

Ms. Brown next compares her relative experience with Ms. Michaels. She points to statements by some of the hiring panel that demonstrate Ms. Brown was a good candidate. This is self-evident, as she was one of only ten applicants to receive an interview (and specifically was requested to be added to the interview list by Justice Gabriel). Ms. Brown also argues she was as qualified or more qualified than Ms. Michaels in certain aspects, including working with Colorado Supreme Court rules. This appears to be the heart of Ms. Brown's dispute: that she was the more qualified candidate.

I have studied carefully all the comparisons Ms. Brown has made with Ms. Michaels and am convinced that under *Sasser*, her allegations do not remotely meet the required standard: "To demonstrate pretext on the theory that a minority applicant had superior qualifications to the prevailing candidate, 'a plaintiff must come forward with facts showing an overwhelming disparity in qualifications.' . . . We will not draw an inference of discriminatory pretext 'based upon minor differences between plaintiff's qualifications and those of successful applicants; rather, there must be an overwhelming merit disparity." 772 F. App'x at 673 (citations omitted).

Ms. Michaels was objectively more experienced in certain aspects of the job, and perhaps Ms. Brown was objectively more experienced in others. Such differences allow significant room for the selecting officials to choose the candidate they find best. I find no basis here for pretext.

## G.    Other Arguments

Ms. Brown discusses a controversial memo within the Colorado Judicial Department that, in my reading, has no relevance to this case. Therefore, I do not address it. She also states that when Justice Gabriel wanted to add Ms. Brown to the interview list and solicited Justice Hart's viewpoint, Justice Hart wrote, "I like her too." In her deposition, Justice Hart admitted this statement was not true, that she was trying to be a good colleague with Justice Gabriel, and that she "didn't like anything about [Ms. Brown's] candidacy." Ms. Brown does not ask me to reach any conclusion from this information, and therefore, I will not.

## H.    Is the Compilation of Ms. Brown's Evidence Sufficient to Establish Pretext?

While I have determined that every single allegation Ms. Brown has made is insufficient to establish pretext on its own, the case law standard for many of the alleged bases for pretext is that they "do not alone" meet a plaintiff's burden. However, I must look at Ms. Brown's arguments, and any irregularities in the hiring process, as a whole. When I do, I must conclude that the sum of the whole of her evidence amounts to no more than the sum of its parts. The totality of evidence underlying Ms. Brown's claim of pretext at best supports only the proposition that Ms. Brown can, in some respects, offer different explanations or interpretations of the events leading to her nonselection, and that this hiring process, like many others, had blemishes and imperfections. But were any of those, alone or in tandem, indicative of discrimination? I find the answer is definitively no.

Because her evidence does not actually dispute any of the core facts and basic underpinnings advanced by Judicial, it fails to impugn Judicial's proffered explanation in a manner that will permit a finding of pretext. As a certainty, it does not meet her burden, for purposes of summary judgment, that she "was rejected under circumstances which give rise to an inference of unlawful discrimination." *Anaeme*, 164 F.3d at 1278. Accordingly, Defendant's motion for summary judgment must be granted.

## CONCLUSION

For the foregoing reasons, Judicial's Motion for Summary Judgment [filed November 23, 2021; ECF 107], is **granted**.  The Complaint is dismissed with prejudice, and the Clerk shall enter judgment for the Defendant and close this case.

Entered and dated at Denver, Colorado, this 3rd day of February, 2022.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge